Filed 6/17/13

CERTIFIED FOR PUBLICATION

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| SOUTHERN CALIFORNIA EDISON COMPANY, | E053938 |
| Cross-complainant and Appellant, | (Super.Ct.No. VCVVS032374) |
| v. | O P I N I O N |
| CITY OF VICTORVILLE, | |
| Cross-defendant and Respondent. | |
| AMANDA LAABS, | E054740 |
| Plaintiff and Appellant, | (Super.Ct.No. VCVVS032374) |
| v. | |
| SOUTHERN CALIFORNIA EDISON COMPANY, | |
| Defendant and Respondent. | |

APPEAL from the Superior Court of San Bernardino County. Gilbert G. Ochoa, Judge. Affirmed in part and reversed in part with directions.

1

Richard Harris Law Firm, Richard A. Harris; Ferguson Case Orr Paterson, Wendy C. Lascher and John A. Hribar for Plaintiff and Appellant.

Patricia A. Cirucci, Brian A. Cardoza; Greines, Martin, Stein & Richland, Timothy T. Coates and Carolyn Oill for Defendant, Cross-complainant, Appellant, and Respondent.

Graves & King, Harvey W. Wimer III and Dennis J. Mahoney for Cross-defendant and Respondent.

Amanda Laabs was injured when the car in which she was riding collided with another car in an intersection and then hit a light pole owned by Southern California Edison Company (SCE). Laabs sued various parties, including the City of Victorville (the City), the County of San Bernardino (the County), and SCE.

The present opinion deals with consolidated appeals from judgments following (1) the trial court's granting of SCE's motion for judgment on the pleadings as to Laabs's second amended complaint, and (2) the trial court's order sustaining, without leave to amend, the City's demurrer to SCE's first amended cross-complaint.

We first address the ruling on SCE's motion for judgment on the pleadings, which we reverse. We then address and affirm the trial court's order sustaining the City's demurrer without leave to amend.

## I.  SCE'S MOTION FOR JUDGMENT ON THE PLEADINGS

A. *Introduction*

This is Laabs's fourth appeal, and the second involving SCE.  In the first two appeals we affirmed summary judgments in favor of the County and the City.[1]  In the third appeal, we reversed summary judgment in favor of SCE.  (*Laabs v. Southern California Edison Co.* (2009) 175 Cal.App.4th 1260, 1279 (*Laabs III*).)  In *Laabs III*, we held that there existed triable issues of fact as to whether SCE owed a duty of care to motorists relative to the placement of street lights immediately adjacent to the traveling lanes of a high-speed roadway.  (*Id.* at p. 1269.)[2]

---

[1] *Laabs v. County of San Bernardino* (May 11, 2007, E039694) [nonpub. opn.]; *Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242 (*Laabs II*).

[2] More specifically, we held:  "To the extent SCE's control over the initial placement of the luminaire is of relevance, SCE did not demonstrate that no triable issue of fact exists as to its lack of control.  It was undisputed that the luminaire was owned and maintained by SCE.  Pursuant to the franchise agreement entered into between SCE and the City of Victorville, it was further undisputed that '[a]ll poles, wires, lights, and electrical apparatus *installed by Company in furnishing service under [the franchise agreement], shall be placed as to work the least possible public and private inconvenience . . . .*'  (Italics added.)  In achieving this end, there is nothing in the agreement indicating that SCE does not have input and control over the luminaire's placement. . . . Even if the *final* decision for placement of the luminaire was made by the City of Victorville and/or developer, it does not put to rest the issue of SCE's input into the decision or establish that SCE was precluded from installing luminaires at other, safer locations within or outside of the street right-of-way.  Thus, even if a public utility can avoid liability for a negligently placed light pole by claiming a government agency required a precise placement, there is insufficient evidence presented here to establish such a requirement.  Simply stated, SCE failed to establish that no triable issue of fact exists as to its role and its exercise of control in determining the placement of the luminaire."  (*Laabs III, supra,* 175 Cal.App.4th at p. 1277, fn. omitted.)

Following remand, SCE moved for judgment on the pleadings based on the argument that the superior court lacked subject matter jurisdiction over the present action. (See Code Civ. Proc., § 438, subd. (c)(1)(B)(i).) Its motion was premised on an argument that Public Utilities Code section 1759[3] precluded the superior court from entertaining any lawsuit dealing with matters that are under the exclusive jurisdiction of the Public Utilities Commission (PUC or Commission). It argued that the placement or location of street lights fell under the exclusive province of the PUC, and the trial court could not entertain an action for damages because it would interfere with the PUC's exercise of its plenary power. More particularly, SCE contended that upon SCE's filing of its tariff with the PUC and the PUC's approval of said tariff, the conditions contained therein had the force and effect of law. SCE submitted that the location of the subject pole was part of the approved tariff and that under the express conditions of the tariff, SCE is relieved of all liability for acting in accordance therewith. (See Pub. Util. Code, § 489, subd. (a).)

The trial court granted the motion and the present appeal ensued. Because the trial court does have subject matter jurisdiction over the present matter, we reverse.

B. *Background*

In Laabs's second amended complaint, she alleges the following facts. Laabs was a passenger in a car driven by James Dimeo. Dimeo was driving northbound on Ridgecrest Road in Victorville. Dimeo's car was struck by another car at an intersection

---

[3] All further statutory references are to the Public Utilities Code unless otherwise indicated.

4

with Pebble Beach Drive, spun out of control and across Ridgecrest Road, and hit a concrete light pole erected 18 inches away from the curb. Laabs was injured. The light pole was owned and maintained by SCE.

Laabs sued SCE on the theory that SCE acted negligently by installing and maintaining the light pole so close to the curb.

C. *Judicially Noticed Documents*

SCE's motion for judgment on the pleadings relies exclusively on documents of which it requested the trial court take judicial notice. First is an "Agreement for Service for Street Lighting" entered into between the City and SCE on August 12, 1977. Attached as exhibits to this agreement are PUC "Schedule No. LS-1," which deals with a "Utility-Owned System" and "Schedule No. LS-2," dealing with a "Customer-Owned Installation."

The second document is a "Schedule LS-1," dated June 5, 1992, dealing solely with company-owned systems.[4] It includes a reference to "Decision 92-06-020."[5] The tariff sets forth certain rates applicable to "street and highway lighting service where [SCE] owns and maintains the street lighting equipment and associated facilities . . . ." It

---

[4] SCE refers to this schedule as a "tariff." In PUC proceedings, a tariff is "'a schedule "showing all rates, tolls, rentals, charges, and classifications . . . together with all rules, contracts, privileges, and facilities which in any manner affect or relate to rates, tolls, rentals, classifications, or service."' [Citation.]" (*Southern Cal. Edison Co. v. Public Utilities Com.* (2000) 85 Cal.App.4th 1086, 1097.) We will refer to the six-page schedule as the "1992 LS-1" or the "tariff."

[5] This appears to refer to the decision in *Matter of Southern California Edison Company* (1992) 44 Cal.P.U.C.2d 471 (Decision No. 92-06-020).

includes two "SPECIAL CONDITIONS" relevant here.  Special condition 6.a. provides: "The applicant for street light service shall specify the type of service, lamp size, and location of street lights."  Special condition 9 provides:  "Liability of Company:  The Company shall not, by taking action pursuant to its tariffs, be liable for any loss, damage, or injury, established or alleged, which may result, or be claimed to result, therefrom."

The third document is a one-page document dated November 21, 1975, and revised April 11, 1979; it appears to be a schematic drawing which includes the descriptions, "City of Victorville" and "Commercial Corner Utility Location."[6]  It shows a utility pole placed 18 inches from the curb.

The trial court granted the request for judicial notice as to each document.

Based on these documents, SCE contends that Laabs's action is barred by section 1759.  Specifically, SCE argues that when the PUC approved SCE's tariff, it exercised its authority over subject matters addressed in the tariff; the tariff required SCE to place street lights where the City wanted them and included a limitation of liability provision; because the location of street lights and the limitation of liability are addressed in the tariff, any issues related to them are subject to the PUC's exclusive jurisdiction and any action addressing them is barred by section 1759.

---

[6] The copy of the street corner design indicates it was an exhibit to the deposition of John McGlade.  That deposition is not part of our record.

Initially, we note that Schedule No. LS-2 (Customer-Owned Installation) appears not applicable. Laabs's second amended complaint alleges that SCE owns the specific street light installation.

Further, the pleading does not allege the date the street light was installed; it is therefore left to some conjecture as to whether the 1976/1977 Schedule No. LS-1 or the 1992 LS-1 applies. This date may be important because if one were to accept SCE's position as to the significance of the release of liability, the release is contained only in the 1992 LS-1, not the 1976/1977 schedules. Additionally, there are no conditions in the earlier schedules referencing "location of street lights." As such, any approval by the PUC of those schedules would not have entailed the siting of street lights. For purposes of our opinion, however, we assume the applicability of the 1992 LS-1.[7]

Lastly, there is nothing about the street corner schematic depicting the location of a utility pole that suggests it was submitted to the PUC or relates to any tariff or PUC decision.

D.  *Standard of Review*

"Code of Civil Procedure section 438, subdivision (c)(1)(B)(i) . . . provides that a motion for judgment on the pleadings may be brought by a defendant on the grounds that the court 'has no jurisdiction of the subject of the cause of action alleged in the

---

[7] As set forth in *Laabs III*, Robert Binns, a supervisor in SCE's street and outdoor lighting department, declared that the subject concrete light pole was erected in 1993. (*Laabs III, supra,* 175 Cal.App.4th at pp. 1264-1265.) Said declaration is not part of the present record.

complaint' . . . . [¶] 'The standard for granting a motion for judgment on the pleadings is essentially the same as that applicable to a general demurrer, that is, under the state of the pleadings, together with matters that may be judicially noticed, it appears that a party is entitled to judgment as a matter of law.' [Citation.]" (*Bezirdjian v. O'Reilly* (2010) 183 Cal.App.4th 316, 321, fn. omitted.) "[J]udgment on the pleadings must be denied where there are material factual issues that require evidentiary resolution." (*Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1216.)

"We review de novo a trial court's judgment on an order granting a motion for judgment on the pleadings. [Citation.] 'On appeal from a judgment on the pleadings, the court assumes the truth of, and liberally construes, all properly pleaded factual allegations in the complaint. [Citation.] The court may also consider . . . matters subject to judicial notice.' [Citation.]" (*Bezirdjian v. O'Reilly, supra,* 183 Cal.App.4th at p. 321.) "'In determining whether the pleadings, together with matters that may be judicially noticed, entitle a party to judgment, a reviewing court can itself conduct the appropriate analysis and need not defer to the trial court.' [Citation.]" (*Id.* at p. 322.) "In fact, we have need *not* to defer . . . ." (*Smiley v. Citibank* (1995) 11 Cal.4th 138, 146.)

E. *Legal Background*

1. Jurisdiction of the PUC

"'The commission is a state agency of constitutional origin with far-reaching duties, functions and powers. (Cal. Const., art. XII, §§ 1-6.) The Constitution confers broad authority on the commission to regulate utilities, including the power to fix rates,

8

establish rules, hold various types of hearings, award reparation, and establish its own procedures. (*Id.*, §§ 2, 4, 6.) The commission's powers, however, are not restricted to those expressly mentioned in the Constitution: "The Legislature has *plenary power, unlimited by the other provisions of this constitution* but consistent with this article, to confer additional authority and jurisdiction upon the commission . . . ." (Cal. Const., art. XII, § 5.)' [Citation.] [¶] Pursuant to this constitutional provision the Legislature enacted, inter alia, the Public Utilities Act. (§ 201 et seq.) That law vests the commission with broad authority to 'supervise and regulate every public utility in the State' (§ 701)[8] and grants the commission numerous specific powers for [that] purpose. . . . [T]he Legislature further authorized the commission to '*do all things*, whether specifically designated in [the Public Utilities Act] *or in addition thereto*, which are necessary and convenient' in the exercise of its jurisdiction over public utilities. [Citation.] Accordingly, 'The commission's authority has been liberally construed' [citation] . . . ." (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 914-915.)

"In particular, the commission has comprehensive jurisdiction over questions of public health and safety arising from utility operations. Thus the commission is generally authorized to require every public utility to 'construct, maintain, and operate' its 'plant,

---

**8** Section 701 provides: "The commission may supervise and regulate every public utility in the State and may do all things, whether specifically designated in this part or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction."

system, equipment, [or] apparatus' in such manner as to 'safeguard the health and safety of its employees, . . . customers, and the public . . . .' (§ 768.) To this end, the commission is further empowered to prescribe the installation and use of 'appropriate safety or other devices,' and to require every utility to do '*any other act* which the health or safety of its employees, . . . customers, or the public may demand.' [Citation.]" (*San Diego Gas & Electric Co. v. Superior Court, supra,* 13 Cal.4th at p. 924.)

"The PUC's most obvious regulatory authority includes the regulation of rates[.]" (*Hartwell Corp. v. Superior Court* (2002) 27 Cal.4th 256, 270; see also Cal. Const., art. 12, § 6 ["The commission may fix rates . . . ."].) "Section 489, subdivision (a), requires every public utility to file with the PUC a tariff—a schedule 'showing all rates, tolls, rentals, charges, and classifications . . . *together with all rules, contracts, privileges, and facilities which in any manner affect or relate to* rates, tolls, rentals, classifications, or service.' Such a tariff, when approved by the PUC, has the force of law." (*Pacific Bell v. Public Utilities Com.* (2000) 79 Cal.App.4th 269, 273-274, italics added.)

In approving a tariff, the PUC has the power to control that which in "any manner affect or relate to rates . . . or service." (*Pacific Bell v. Public Utilities Com., supra,* 79 Cal.App.4th at p. 274.) As part of this power, the PUC may also limit the liability of the utility to the public. In a case involving a telephone company tariff, the court explained that the limitations on liability are "an equitable trade-off—the power to regulate rates and to set them below the amount an unregulated provider might otherwise charge

10

requires a concomitant limitation on liability." (*Los Angeles Cellular Telephone Co. v. Superior Court* (1998) 65 Cal.App.4th 1013, 1017-1018.)

Further, and as directly relevant to the present motion, section 1759, subdivision (a) states: "No court of this state, *except the Supreme Court and the court of appeal*, . . . shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission *in the performance of its official duties, as provided by law and the rules of court*." (Italics added.)

Bearing in mind the basic plenary power of the PUC, the Legislature has provided for a limited scope of private action against a utility for damages. As set forth in section 2106: "Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom. . . . An action to recover for such loss, damage, or injury may be brought in any court of competent jurisdiction by any corporation or person."

2. <u>The Relationship of Sections 1759, 2106, and Local Regulation to the Present Facts</u>

The question before us is whether the present action for damages is precluded by the overall grant of plenary power to the PUC by the Constitution and sections 701 and

11

1759, or falls within the limited exception of section 2106. In addressing a similar issue, the court in *San Diego Gas & Electric Co.* stated: "Addressing the question of statutory construction, this court [in *Waters v. Pacific Telephone Co*. (1974) 12 Cal.3d 1] declared the primacy of section 1759 and the correspondingly limited role of section 2106. The [*Waters*] court held that 'in order to resolve the potential conflict between sections 1759 and 2106, the latter section must be construed as *limited* to those situations in which an award of damages would not hinder or frustrate the commission's declared supervisory and regulatory policies.' [Citation.] . . . '[T]he two sections must be construed in a manner which harmonizes their language and avoids unnecessary conflict. Section 2106 reasonably may be interpreted as authorizing only those actions which would not interfere with or obstruct the commission in carrying out its own policies.' [¶] Under the *Waters* rule, accordingly, an action for damages against a public utility pursuant to section 2106 is barred by section 1759 not only when an award of damages would directly contravene a specific order or decision of the commission, i.e., when it would 'reverse, correct, or annul' that order or decision, but also when an award of damages would simply have the effect of undermining a general supervisory or regulatory policy of the commission, i.e., when it would 'hinder' or 'frustrate' or 'interfere with' or 'obstruct' that policy." (*San Diego Gas & Electric Co. v. Superior Court, supra,* 13 Cal.4th at pp. 917-918, fn. omitted.)

As such, if the PUC (1) has the authority to regulate or otherwise establish policy in a given area, and (2) has exercised that authority by regulation or policy, then the

12

superior court may do nothing that hampers or interferes with that exercise of jurisdiction, including awarding damages in a private action.  (See generally *San Diego Gas & Electric, supra,* 13 Cal.4th at pp. 914-934.)  Stated another way, "[t]he [PUC] has exclusive jurisdiction over the regulation and control of utilities, and that jurisdiction, once assumed, cannot be hampered or second-guessed by a superior court action addressing the same issue." (*Anchor Lighting v. Southern California Edison Co*. (2006) 142 Cal.App.4th 541, 548.)

With the above said, a city exercising its police powers may impose conditions and regulations upon a public utility to the extent they are not in conflict with the exercise of jurisdiction by the PUC.  As explained in *Orange County Air Pollution Control Dist. v. Public Util. Com.* (1971) 4 Cal.3d 945:  "'[C]oncurrent jurisdiction . . . may well exist as to some matters but . . . if . . . there is a direct confrontation with the jurisdiction exercised by this Commission . . . the jurisdiction of this Commission in the matter is either exclusive or paramount. . . .'  [¶]  . . . [T]he commission has been held to have paramount jurisdiction in cases where it has exercised its authority, and its authority is pitted against that of a local government involving a matter of statewide concern." (*Id.* at pp. 950-951, fn. omitted.)

As stated in *San Diego Gas & Electric Co. v. City of Carlsbad* (1998) 64 Cal.App.4th 785:  "The general authorization for a local entity's police power is found in California Constitution, article XI, section 7:  'A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in

13

conflict with general laws.'  California Constitution, article XI, section 9, subdivision (b) permits municipalities to prescribe conditions and regulations for the operation of public utility works by private entities."  (*Id.* at p. 795.)

Finally, section 2902 provides that the chapter of the Public Utilities Code governing the surrender of municipal control to the PUC "shall not be construed to authorize any municipal corporation to surrender to the commission its powers of control to supervise and regulate the relationship between a public utility and the general public in matters affecting the health, convenience, and *safety of the general public*, including matters such as the use and repair of public streets by any public utility, *the location of the poles*, wires, mains or conduits of any public utility, on, under, or above any public streets . . . ."  (Italics added.)

F.  *Discussion*

    1.  <u>The PUC Does Not Have Exclusive Jurisdiction Over the Location of Street Lights</u>

As previously indicated, SCE's basic position is:  (1) the PUC has the authority to regulate the siting of light poles; (2) the PUC has exercised that authority by approving the tariff.  Included within the tariff is language dealing with "location of poles" and a release of liability as to actions taken in compliance with the tariff.  As such, SCE argues that (3) allowing a plaintiff to recover damages resulting from actions pursuant to the tariff would interfere with the PUC's jurisdiction and is thus precluded by section 1759. We disagree.

14

As evident from the above, the PUC has general plenary power over utilities. At the same time, local municipalities may, pursuant to their police power, regulate utilities to the extent the regulation is not inconsistent with law. More specifically, a city may control the location of utility poles within its jurisdiction.

Initially, SCE has not cited to any specific PUC policy, regulation, decision or study which indicates that it has exercised authority over the siting of street lights. Indeed, the closest this court can come to determining whether the PUC has entered the field of controlling the location of utility poles is in *In re Competition for Local Exchange Service* (1998) 82 Cal.P.U.C.2d 510 (Decision No. 98-10-058).[9] At one portion of its order, the commission addresses its jurisdiction relative to section 2109. It states: "The obligations of a city, county or other political subdivision to provide access to [right-of-way] under its control is addressed under Part 3 of the [Public Utilities] Code. The Legislature has expressly recognized the duties and responsibilities of a 'municipal corporation,' and the ability of a municipal corporation to retain or surrender control of some of its powers to the Commission. Municipal corporations are expressly authorized not to surrender the power to supervise and regulate the relationship between such public utilities and the general public 'in matters affecting the health, convenience, and safety of the general public, including matters such as the use and repair of public streets by any

---

[9] Decision 98-10-058 does not deal with light poles. The decision deals with access to poles by telecommunication companies. As indicated by the commission: "We establish rules for [right-of-way] access in this decision pursuant to our jurisdictional authority . . . ." (Decision No. 98-10-058 at p. 530.)

15

public utility, the location of the poles, wires, mains, or conduits of any public utility, on, under, or above any public streets . . . .' (Section 2902.)  [¶]  . . . [¶]  . . . [L]ocal governments thus may regulate the time, location, and manner of installation of telephone facilities in public streets, [but] they may not arbitrarily deny requests for access by public utilities . . . ."  (Decision No. 98-10-058 at pp. 543-544; see also *Southern Cal. Gas Co. v. City of Vernon* (1995) 41 Cal.App.4th 209, 217-218 ["The language of Public Utilities Code section 2902 simply reflects that the *location* of pipelines beneath city streets . . . [is a matter] for the municipal corporation, not the PUC."].)

The Commission goes on to explain that if the telecommunications company is unable to resolve its dispute with the local entity as to siting and right-of-way access, then it can apply to the PUC for a "certificate of public convenience and necessity."  (Decision No. 98-10-058, pp. 544-545.)  In so indicating, however, the PUC states:  "We recognize that the Commission lacks the jurisdiction to directly order a local governmental body to grant access.  In the event that we grant the siting authority sought in the application, it will be the responsibility of the telecommunications carrier to notify the local governmental body of the Commission's order.  In the event that we grant such an application, and the local governmental body still refuses to grant access in accordance with the Commission order, the telecommunications carrier's recourse shall be to file a lawsuit in the appropriate court of civil jurisdiction seeking resolution of the dispute over access."  (*Id.* at p. 545.)

16

Here, the City's schematic depicting a street light located 18 inches from the curb face indicates that the City has exercised control over the location of the street light. (See § 2902.) Although the PUC could perhaps exercise jurisdiction over the placement of poles, nothing in the 1992 LS-1 or the PUC's related decision indicates that it has. Indeed, it appears otherwise. As stated in special condition 6.a.: "The *applicant* [City of Victorville] for street light service shall specify the type of service, lamp size, and *location of street lights*." (Italics added.) Thus, to the extent the PUC and the City had concurrent jurisdiction over the location of street lights, the PUC, in accordance with *San Diego Gas & Electric Co.* and its own construction of section 2902, allowed the City to exercise its jurisdiction as to the siting of the street lights. As such, the City's exercise of jurisdiction is not inimical to the Public Utilities Act.

Although the PUC has the *authority* to regulate the siting of light poles as a condition affecting or relating to the rates, tolls, rentals, classification, or service (see § 489, subd. (a)), the tariff in this case indicates that the City, *not the PUC*, has control over the siting of light poles. We therefore reject SCE's argument that the PUC's approval of the tariff constitutes an exercise of the PUC's jurisdiction over that subject matter.

The release of liability found in special condition 9 of the 1992 LS-1 is also inapplicable. As provided: "The Company shall not by taking action pursuant to its tariffs, be liable for any loss, damage, or injury, established or alleged, which may result, or be claimed to result therefrom." Because the placement of light poles was generally

17

under the control of the City, SCE did not take any action with respect to the placement of the light poles "pursuant to its tariffs."[10] As a result, the limitation of liability provision is inapplicable.

While defendant argues that a utility may limit its liability to the public by way of a tariff, we note that all of the cases setting forth this proposition, save one, deal with phone service and involve subscribers to the service. Additionally, and again with one exception, the cases postdate and refer to the PUC decision in *In re Telephone Corporations* (1970) 71 Cal.P.U.C. 229, wherein the Commission specifically investigated "all rules, conditions or tariff provisions limiting the liability of telephone corporations." (*Id.* at p. 231.)

We have not found and have not been cited to any PUC decision addressing limitations on liability for utilities other than those providing phone services. Further, as alluded to in *Thrify-Tel, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559, 1571, "[a]lthough article XII, sections 4 and 6 of the California Constitution authorize the commission to establish *rates* utilities may charge for their services, it is a debatable question as to whether they empower the PUC to liquidate a utility's tort damages against third parties." (See also *Colich & Sons v. Pacific Bell* (1988) 198 Cal.App.3d 1225, 1238, fn. 15

---

[10] In *Laabs III*, we held that a triable issue of fact existed on the issue of duty. We found that SCE failed to demonstrate that it did not exercise some control over the placement of the street light. Although the 1992 LS-1 indicates that the City was to select the placement of light poles, this does not preclude, from a practical standpoint, SCE having input into or control over the placement of the street light. This issue is clearly a fact-specific inquiry that cannot be resolved by way of a motion for judgment on the pleadings.

18

[inapplicability of limitation of liability provisions to cases involving personal injuries by third parties].)

In conclusion, we find that while the PUC may have concurrent jurisdiction with the local entity relative to the placement of light poles, it did not, in this case, exercise that authority. Moreover, there is nothing about an award of damages against SCE that would directly contravene a specific order or decision of the commission, or would have the effect of undermining a general supervisory or regulatory policy of the commission. Therefore, under section 2106, the superior court has jurisdiction to maintain the present action.

## II. CITY'S DEMURRER TO SCE'S FIRST AMENDED COMPLAINT

A. *Introduction*

SCE did not file a timely governmental claim against the City before filing its first amended cross-complaint naming the City as a cross-defendant. The trial court sustained the City's demurrer without leave to amend based on SCE's failure to comply with the government claims statute. Both at the trial level and on appeal, SCE contends it did not need to file a claim because its cross-complaint for equitable indemnity was solely defensive in nature. (See *Krainock v. Superior Court* (1990) 216 Cal.App.3d 1473 (*Krainock*).) We agree with the trial court and affirm the judgment entered thereon. More particularly, we find that SCE's cross-complaint is based on facts outside of the pleadings, of which the City was a party, such that the cross-complaint is not solely

19

defensive in nature.  Because of this, compliance with the Government Claims Act was necessary.

B.  *Background*

In October 2003, Laabs filed her initial complaint against the driver, owners, and manufacturer of the vehicle in which she was a passenger.  Additional named defendants were the driver of the other vehicle, as well as the City of Victorville and the County of San Bernardino.  The theory against the City and the County was that they were "negligent in designing, constructing, maintaining, controlling and otherwise creating and failing to correct a dangerous road condition due to inadequate sight distance and lack of warning signs, devices and signals."  Fifty "Doe" defendants were named.  Ten Doe defendants were associated with the dangerous condition of public property.  The remaining Doe defendants were alleged to be associated in some way to the vehicle in which Laabs was a passenger or the other vehicle involved in the accident.[11]

---

[11] Laabs filed an amended complaint on March 15, 2004.  Although it is not in the record on this appeal, it was a subject of our decision in *Laabs II*.  In that case, we noted the following allegations regarding the physical property involved in the accident: "'Plaintiff was a passenger in a vehicle northbound on Ridgecrest Road driven by James Dimeo, Jr., in the vicinity of its intersection with Pebble Beach Road in Victorville, unincorporated County of San Bernardino.  Another vehicle driven by Dorothy Jean Specter was westbound on Pebble Beach Road stopped at a stop sign before attempting a left turn to go south on Ridgecrest Road.  There was inadequate sight distance so that Specter did not perceive the approaching Dimeo vehicle which struck the Specter vehicle. Based upon information and belief, the [City] is responsible for the design, construction, maintenance and conrol [*sic*] of the southbound lanes of Ridgecrest Road.  Based upon information and belief, [County] is responsible for the northbound lanes of Ridgecrest Road.  Defendants [City] and [County] were negligent in designing, constructing, maintaining, controlling and otherwise creating and failing to correct dangerous road conditions due to inadequate sight distance and lack of warning signs, devices and

*[footnote continued on next page]*

Laabs's original complaint makes no allegations of any condition of property north of the intersection of Ridgecrest Road and Pebble Beach Drive. Additionally as to the Doe defendants associated with the property, the allegations deal solely with inadequate sight distance at the intersection and the absence of warning signs and signals. Laabs's complaint additionally omits any allegation that the Doe defendants were negligent in ways unknown to plaintiff.

On April 14 and April 16, 2004, the City filed two successive cross-complaints. The more recent cross-complaint named as cross-defendants each of the City's named codefendants. It further alleged that unknown "Moe" cross-defendants were jointly and severally liable for plaintiff's injuries "*as alleged in the Complaint in this action. . . .*" (Italics added.) In its charging allegations, the City's cross-complaint went on to allege: "9. If Plaintiff sustained damages as alleged in her complaint, these damages were caused, entirely or in part, by Cross-Defendants *as set forth herein*: [¶] a. The County of San Bernardino owned and controlled the northbound lanes of Ridgecrest Road and Pebble Beach Drive, and if there was a dangerous condition thereon the County of San Bernardino is responsible therefor; [¶] b. James Dimeo, Jr., operated his vehicle in a negligent, careless, reckless and wanton manner, driving at a speed in excess of 100 miles per hour while under the influence of alcohol and/or intoxicating drugs; [¶] c. Cross-

---

*[footnote continued from previous page]*
signals. The dangerous conditions created an unreasonable risk of injury to persons using the roads and such dangerous conditions were a foreseeable cause of Plaintiff's injuries.'" (*Laabs II, supra,* 163 Cal.App.4th at p. 1252.)

21

Defendants James Dimeo, Sr. and Tina Dimeo negligently supervised James Dimeo, Jr., their minor child, in that they knew of their child's dangerous tendency and propensity to take and operate the vehicle involved in the collision without authorization and in a reckless and careless manner. These Cross-Defendants failed to take the appropriate action and corrective measures to prevent James Dimeo, Jr. from intentionally or negligently inflicting harm on others. These Cross-Defendants further failed to secure the vehicle to prevent unauthorized use by James Dimeo, Jr. Cross-Defendants' actions and failure to act resulted in the injuries and damages sustained by Plaintiff; [¶] d. The vehicle driven by James Dimeo, Jr. a 1999 Porsche Carrera, California License number 4GYX773, including its component parts, failed to perform in a manner reasonably to be expected in light of its nature and intended function, including but not limited to failing to stay under control and failing to provide adequate protection and restraint of its occupants; [¶] e. Cross-Defendant Dorothy Jean Specter operated her vehicle negligently at the time of the collision by failing to exercise due care to ensure that she could enter safely into the roadway."

As with the complaint, the City's cross-complaint is based upon limited facts. There is nothing in the cross-complaint that speaks to conditions of property that are adjacent to the southbound lanes of Ridgecrest Road north of its intersection with Pebble Beach Drive.

22

In May 2005, the trial court granted the City's motion for summary judgment as to Laabs's complaint. An appeal followed.[12] While the appeal was pending, Laabs filed her second amended complaint. In this pleading, Laabs omitted the City and the County as named defendants. She added SCE to the action. The alleged basis for SCE's liability was its ownership of the luminaire and its dangerous proximity to the traveling lanes of Ridgecrest Road. SCE was served with the second amended complaint on October 13, 2005.

In November 2005, SCE filed a cross-complaint for indemnity and contribution against James Dimeo and his parents. SCE also included an affirmative cause of action for damages for the repair of the luminaire.[13]

In July 2007, almost two years after being served with the second amended complaint, SCE was granted summary judgment as to Laabs. Two years later, in July

---

[12] At the trial court level, in response to the City's motion for summary judgment, Laabs introduced for the first time the alleged dangerousness of the luminaire, which was located north of the intersection and immediately adjacent to the southbound lanes of Ridgecrest Road. On appeal, we held that the City could not, given the state of the pleadings, be found liable for the alleged dangerousness of the luminaire as it related to the traveling lanes of Ridgecrest Road. As we explained: "The pleading does not mention any facts involving the southbound lanes or, more importantly, the fact that the Dimeo vehicle struck a luminaire, pole, or some similar object. In the amended complaint, there is no explicit or implicit involvement of the luminaire. The additional [undisputed] fact shifts the alleged dangerous condition to a portion of public property not remotely referenced in the amended complaint. It attempts to predicate liability on a totally different condition, not the least bit involved with the intersection or inadequate sight distance." (*Laabs II, supra,* 163 Cal.App.4th at p. 1258.)

[13] SCE's cross-complaint was filed in response to Laabs's second amended complaint wherein the City was not named as a defendant.

2009, this court reversed the judgment. (See *Laabs III, supra,* 175 Cal.App.4th 1260.) Following the Supreme Court's denial of SCE's petition for review, the matter was remanded to the superior court in November 2009. Approximately three months later, SCE filed a governmental claim against the City. In the claim, SCE sought indemnification and costs of defense from the City based on the allegation that "[t]he City made the decision with regards to the location of installation, type of equipment to use, mounting height, type of light and wattage/light output for the area streetlights, including the electrolier." The claim was returned to SCE as being untimely.

Thereafter, in January 2011, after filing another claim which was also returned as untimely,[14] SCE filed a first amended complaint seeking indemnification from the City. In the cross-complaint, SCE alleged it substantially complied with the claims requirement. In March 2011, the City filed a demurrer contending, among other arguments, that SCE's cross-complaint was barred because of its failure to comply with the Government Claims Act. The trial court agreed and sustained the demurrer. Following the entry of judgment for the City, SCE filed the present appeal.

C. *Standard of Review*

"On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, the standard of review is well settled. We give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.]

_____

[14] The 2011 claim was premised on the same facts as the 2010 claim.

24

Further, we treat the demurrer as admitting all material facts properly pleaded . . . . When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action." (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865.) Where a cross-complaint seeks indemnity from a governmental entity stemming from an underlying personal injury action, compliance with the claims statute is required. (*State of California v. Superior Court* (1983) 143 Cal.App.3d 754, 757.) "Failure to allege compliance with the claims statute renders the complaint subject to general demurrer. [Citation.] [¶] . . . [¶] . . . [a cause of] action for damages is barred unless an exception relieves them of this requirement." (*Bates v. Franchise Tax Bd.* (2004) 124 Cal.App.4th 367, 382-383.)

D. *Discussion*

Pursuant to Government Code section 901: "[T]he date upon which a cause of action for equitable indemnity or partial equitable indemnity accrues shall be the date upon which a defendant is served with the complaint giving rise to the defendant's claim for equitable indemnity or partial equitable indemnity against the public entity." A claim for money damages relating to a cause of action for injury to a person must be filed not later than six months of the date of accrual of the cause of action. (Gov. Code, §§ 905, 911.2, subd. (a).)

"The claim filing requirements apply to 'all claims for money or damages against the [governmental entity] . . . for an injury for which the [entity] is liable.' [Citation.]" (*State of California v. Superior Court, supra,* 143 Cal.App.3d at p. 757.)

25

Notwithstanding SCE's prayer for declaratory relief, its cross-complaint "in essence states a claim 'for money or damages,' against the [governmental entity], 'relating to a cause of action . . . for injury to person,' and hence is subject to the requirement that a claim be presented 'not later than [six months] after the accrual of the cause of action.' [Citations.]" (*Ibid.*)

Here, both parties to the appeal agree that SCE did not comply with the applicable claim filing requirement. Laabs's second amended complaint was served on SCE on October 13, 2005; SCE did not file a claim until January 2010, more than four years later.[15]

On appeal, SCE contends it is excused from filing a claim against the City because its cross-complaint is solely a defensive pleading and as such the governmental claim requirements do not apply. To support its position, SCE relies on *Krainock, supra,* 216 Cal.App.3d 1473, wherein the court held that a defendant may file a defensive cross-complaint for indemnity against a public entity which has already filed a cross-complaint against it without first filing a claim. We disagree with SCE that *Krainock* is applicable to the present facts.

In *Krainock*, plaintiff Fiorello filed a personal injury action against defendants Krainock and the Poway Unified School District. Fiorello claimed that Krainock struck

---

**15** Even if its claim for equitable indemnity was viewed as being a claim not related to a "cause of action . . . for injury to person," thus allowing it to be filed "not later than one year after the accrual of the cause of action" (Gov. Code, § 911.2), there is still no question that SCE's claim was not timely filed.

him during a "fracas" at a school athletic event. The school district was sued on a premises liability theory. (*Krainock, supra,* 216 Cal.App.3d at pp. 1475-1476.) At the time of filing its answer, the school district filed a cross-complaint for indemnity, apportionment, and declaratory relief against Krainock. Krainock thereupon answered the cross-complaint and, without filing a governmental claim against the school district, filed a cross-complaint against the school district for the same relief sought by the school district in its cross-complaint. (*Ibid.*)

The Court of Appeal held that Krainock did not need to comply with the claims statute before filing his cross-complaint. (*Krainock, supra,* 216 Cal.App.3d at pp. 1478-1479.) The court stated: "The primary purpose of the governmental claims act is to apprise the governmental body of an imminent legal action so that the entity may investigate and evaluate the claim and, where appropriate, avoid litigation by settling meritorious claims. Thus, the act should not be allowed to become a snare for the unwary litigant if its stautory purposes have been satisfied." (*Id.* at p. 1477.) In applying this principle, the court stressed that "Krainock thus seeks to defend both the complaint and the cross-complaint on the *same set of facts. . . .* He thus contends his cross-complaint will require *no new investigation of the facts beyond that which [the school district] already performed in preparing its pleadings.*" (*Id.* at pp. 1476-1477, italics added.)

Such is not the case here. We first note that the City never filed a cross-complaint in which SCE was a named cross-defendant. Thus from its inception, SCE's argument is misplaced.

27

To the extent the City's cross-complaint naming "Moes 1-30" could be construed as a cross-complaint against SCE, SCE's argument that its cross-complaint is purely a defensive pleading is still unsupportable. SCE's cross-complaint goes beyond the set of facts upon which the City defended Laabs's complaint and upon which the City's cross-complaint was premised. As a result, in order to defend the cross-complaint filed by SCE it would have to engage in new investigation beyond that which it already performed in preparing its initial answer and cross-complaint. As such, compliance with the claims statute would be necessary.

All of Laabs's allegations against the City dealt with inadequate sight distance at the intersection and the absence of warning signs and signals. The complaint made no reference to a luminaire or any condition of property north of the intersection of Ridgecrest Road and Pebble Beach Drive. There were no Doe allegations that any of the Doe defendants were negligent in ways unassociated with the intersection or the vehicles involved in the accident. Likewise, the City's second amended cross-complaint was extremely focused as to the basis upon which the City was seeking indemnity. It was limited to the allegations of the complaint and specifically alluded to the areas of the cross-defendants' conduct for which the City was seeking indemnity or contribution. There was nothing in the cross-complaint that remotely spoke to conditions of property adjacent to the southbound lanes of Ridgecrest Road north of its intersection with Pebble Beach Drive. There was nothing that broadened the scope of the persons from whom the City was seeking indemnity or the facts upon which it was seeking indemnity.

28

The City's involvement in the litigation was clearly limited to the design of the intersection, the design of Ridgecrest Road south of the intersection, and the signage for northbound traffic leading up to the intersection. This is made abundantly clear by the discussion in *Laabs II* wherein we stated: "The pleading does not mention any facts involving the southbound lanes or, more importantly, the fact that the Dimeo vehicle struck a luminaire, pole, or some similar object. In the amended complaint, there is no explicit or implicit involvement of the luminaire. The additional [undisputed] fact shifts the alleged dangerous condition to a portion of public property not remotely referenced in the amended complaint. It attempts to predicate liability on a totally different condition, not the least bit involved with the intersection or inadequate sight distance." (*Laabs II, supra,* 163 Cal.App.4th at p. 1258.)

SCE's cross-complaint, which brings into play the City's involvement in the siting of the luminaire north of the intersection of Ridgecrest Road and Pebble Beach Drive, is clearly based on a set of facts different from the original complaint and the City's second amended cross-complaint. To defend SCE's cross-complaint, the City would be required to perform investigation of facts beyond that which the City already performed in preparing its pleadings and participating in the original action.

SCE's cross-complaint is far more than merely a defensive pleading to the City's cross-complaint, which does not name SCE and does not state a cause of action for

29

indemnity against SCE.[16]  As such, SCE was required to file a timely claim before instituting its action against the City for indemnity.

In its reply brief, SCE states:  "If the City is correct, SCE is caught in a legal Catch-22:  SCE was required to present a claim for damages to the City within six months after SCE was served with Laabs' amended complaint; however, even if SCE had done so, it would still be barred from obtaining any relief from the City because the City was already out of Laabs' case before SCE's claim was due.  Not only can SCE not win, it was barred from obtaining relief before it even knew it was involved in the case.  This result is contrary to both logic and law."  This is simply not correct.

A "'defendant's equitable indemnity action is independent of the plaintiff's action and a defendant is entitled to pursue his own indemnity action so long as the statute of limitations on that action has not expired.'"  (*Columbus Line, Inc. v. Gray Line Sight-Seeing Companies Associated, Inc.* (1981) 120 Cal.App.3d 622, 631.)  "'[U]nder the governing provisions of . . . Code of Civil Procedure [section 428.10, subdivision (b)], a named defendant is authorized to file a cross-complaint against any person, *whether already a party to the action or not*, from whom the named defendant seeks to obtain total or partial indemnity. . . .' [Citations.]" (*Paragon Real Estate Group of San*

---

**16** The court in *Krainock*, adopted a three-prong test for determining whether a cross-complaint is purely defensive, thus being exempt from the claims requirements. (*Krainock, supra,* 216 Cal.App.3d at pp. 1478-1479.)  The present cross-complaint clearly does not conform to the second prong of the test.  As discussed, SCE's claims, while arising out of the same accident, introduces claims unrelated to the facts upon which the City participated in the underlying action.

*Francisco, Inc. v. Hansen* (2009) 178 Cal.App.4th 177, 183.) Finally, absent the application of collateral estoppel or res judicata, the dismissal of a defendant from the plaintiff's action, even by way of summary judgment, does not preclude another defendant from pursuing indemnity, by way of cross-complaint, from the dismissed defendant. (*Frank v. State of California* (1988) 205 Cal.App.3d 488, 493-495.)

Here, there was nothing that precluded SCE from filing a timely claim and cross-complaint against the City. The fact that the City had received a summary judgment did not preclude SCE from moving forward with its cross-action in a timely manner.[17]

---

[17] Whether its cross-action would have been the subject of a motion for summary judgment by the City is a matter which we do not address here. Based on the briefing in the present matter, it is clear that SCE believes that the City's summary judgment as to plaintiff's complaint would not act as a bar to SCE's cross-complaint under the theory of collateral estoppel. The City argues that it would. We do not address this issue because we affirm the trial court's decision based on the fact that SCE did not comply with the appropriate governmental claims statutes.

## III.  DISPOSITION

The judgment in favor of SCE and against Laabs is reversed.  The court shall vacate its order granting SCE's motion for judgment on the pleadings and enter a new order denying that motion.

The judgment in favor of the City and against SCE is affirmed.

Laabs and the City shall recover their costs on appeal.

CERTIFIED FOR PUBLICATION

KING

J.

We concur:

HOLLENHORST

Acting P. J.

MILLER

J.