Filed 7/14/14  Estate of Lanferman CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| Estate of PAUL E. LANFERMAN, Deceased. | |
| SUSAN M. LANFERMAN, Petitioner and Respondent, v. DAVID P. LANFERMAN, Objector and Appellant. | A137254 (Alameda County Super. Ct. No. RP 12-612456) |

In this probate proceeding, David P. Lanferman[1] appeals from an order granting a motion for judgment on the pleadings in favor of his step-mother, Susan M. Lanferman, with respect to her spousal property petition.  Paul E. Lanferman—Susan's husband and David's father—died testate on June 2, 2011.  David argues that the probate court erred by refusing to consider extrinsic evidence offered to show that his father intended to give Susan only a life estate in Paul's portion of the couple's community property, rather than a fee interest.  The probate court concluded that the extrinsic evidence offered by David was insufficient to create any ambiguity in the clear language of Paul's will granting a fee interest to Susan.  It therefore granted Susan's motion for judgment on the pleadings,

---

[1] The parties to this proceeding bear the same surname.  Thus, to avoid confusion—and meaning no disrespect—after a person is introduced, he or she may subsequently be referred to by first name.

1

dismissed David's opposition, and granted the spousal property petition. Finding the probate court's analysis in this case entirely appropriate, we affirm.

## I. FACTS AND PROCEDURAL BACKGROUND

The facts in this matter are undisputed. On June 8, 1984, Paul executed an instrument entitled "Last Will and Testament of Paul E. Lanferman" (Will). Although it is not a part of the record in these proceedings, Susan also reportedly executed a will on June 8, 1984, with terms similar to Paul's Will. In addition, on that same date, Paul and Susan executed an agreement entitled "Contract Not to Revoke Wills" (Contract). Subsequently, on May 27, 1989, the couple amended the terms of the Contract in an agreement entitled "Amendment to Contract Not To Revoke Wills" (Amendment).

As a result of their marriage, Paul and Susan possessed certain community property (Community Property), including the family residence located in Fremont, California (Residence).[2] Paul and Susan each had children from previous marriages. Paul had two adult children, including David. Susan has four adult sons. The gist of the estate planning documents referenced above was to ensure that any Community Property still in existence after the death of the surviving spouse would be split equally among all six of the couple's children.

Specifically, Paul's Will provides as follows: "I hereby confirm unto my wife, SUSAN MARIE LANFERMAN, her one half (1/2) share of our community property. *I further give, devise, and bequeath to my wife, SUSAN MARIE LANFERMAN, my one-half (1/2) share of our community property owned on the date of my death, including, but not limited to, our [Residence]*, which I have transmuted to community property during our marriage, if my said wife should survive me for thirty (30) days" (italics added). If Susan had predeceased Paul, the Will provides that the Community Property would have been split in six equal shares among Paul's children and step-children. Any separate property of Paul's is to be divided equally between his two biological children.

---

[2] Indeed, the record reflects that the Residence may be the couple's only community asset and the only asset in Paul's estate.

The Will makes no reference to any documents outside of itself. It nominates David as executor, but further provides that the Residence may not be sold by the executor during Susan's lifetime without her prior written consent. Finally, the Will also expresses Paul's hopes regarding his blended family's reaction to his testamentary plan, stating: "The bequests which I have made herein reflect the love and respect which I equally feel for both of my families, my two beloved children, DAVID and JANIS, as well as my loving wife, SUSAN, and her sons. It is my desire that they respect my wishes as reflected by my bequests herein, and that the mutual love I have for them all continues through family harmony between them all after my death."

The Contract executed by Paul and Susan on the same date in 1984 as their respective wills further elucidates the couple's testamentary intent as follows: "It is the desire and intention of the parties that upon the death of the surviving spouse, the community property of the parties be shared equally among all of the children of both parties. Accordingly, the parties have agreed that the children of both spouses shall share equally in the community property of the parties and have so provided in paragraph Fifth of [Paul's Will] and in paragraph Fifth of [Susan's will]." To effectuate this intent, the Contract requires that neither party revoke, alter, or amend the relevant paragraph of his/her will without the prior written consent of the other spouse. After the death of one spouse, such written consent may also be obtained from "all of the surviving and competent children of the deceased spouse." Copies of Paul's Will and Susan's will are incorporated by reference into the Contract.

In 1989, the couple executed the Amendment "in order to make clear the intention of the parties that the survivor of them shall have full freedom of utilization of the community property of the parties during the lifetime of the survivor, and that the survivor may sell community property and [reinvest] the proceeds thereof as the survivor may in his/her discretion deem appropriate." Towards this end, the Amendment provides that the surviving spouse shall have "a complete and unrestricted right to utilize" the Community Property; that such spouse shall have "complete management" of the Community Property, including the right to sell it and "utilize, enjoy or [reinvest] the

3

proceeds" as deemed appropriate in "his/her sole discretion"; that there is no intention to "restrict the enjoyment" of the Community Property by the surviving spouse; and that the manner of such utilization and enjoyment of the Community Property "shall not be subject to challenge by any of the children . . . ."

After the death of the surviving spouse, the Amendment reiterates "*that which then remains*" of the Community Property or its proceeds be divided equally among all of the couple's children (italics added). However, the interest of the children in any such remaining property "is of secondary concern." In contrast, the "interest, comfort, care and welfare of the surviving spouse" is "the primary consideration," and the devise by each spouse in their respective wills was made "primarily for the welfare of the surviving spouse."[3]

Over twenty years later, Paul died testate on June 2, 2011.

Thereafter, Susan—having survived Paul for over thirty days as required by the terms of the Will—filed a spousal property petition on January 12, 2102, seeking to confirm that Paul's interest in the Community Property had passed to her upon Paul's death. On February 9, 2012, David filed an opposition to the spousal property petition, arguing that any transfer to Susan of Paul's interest in the Community Property should expressly reference the "encumbrances" created by the Contract and the Amendment. In response, Susan filed a motion for judgment on the pleadings pursuant to subdivision (c) of section 438 of the Code of Civil Procedure, contending that David had failed to state a cause of action that would permit the court to disallow the relief Susan sought in her petition.

On July 18, 2012, the probate court granted Susan's motion for judgment on the pleadings with leave to amend. In response, David filed an amended opposition to Susan's spousal property petition on July 30, 2102. In his revised pleading, David asserted that, while the Will might be unambiguous on its face, the Contract and the

---

[3] The Amendment also expressly authorizes the surviving spouse to utilize Community Property proceeds to assist Susan's grandchildren in obtaining their undergraduate degrees.

Amendment reveal a latent ambiguity in the Will demonstrating that Paul's intention was not to devise his share of the Community Property to Susan outright, but was instead to create a life estate in that Community Property. According to David, since the Contract and the Amendment provide an alternative meaning to which the Will is "reasonably susceptible," the probate court was required to admit the extrinsic evidence to interpret the Will and determine Paul's actual intention at trial.

On August 22, 2012, Susan filed a second motion for judgment on the pleadings, arguing that David had again failed to state viable grounds for relief. In support of her motion, Susan asserted that the Will did not incorporate the Contract or Amendment by reference and that there was no language in the actual Will that was "reasonably susceptible" to the interpretation advanced by David. Thus, Paul's intent with respect to the Community Property should be determined from the " 'four corners' " of his Will.

The probate court agreed with Susan. Specifically, it concluded that a will must be interpreted to ascertain the testator's intention as expressed in the *words of the will*. Since, in this case, the words in Paul's Will were susceptible to only one meaning, no evidentiary hearing was necessary and the plain language of the Will controlled. Based on this analysis, the probate court, on October 2, 2012, granted Susan's motion for judgment on the pleadings, dismissed David's opposition, and granted the spousal property petition. Notices of entry for both the spousal property order and the order for judgment on the pleadings were served on David by Susan that same day and filed with the probate court on October 9, 2012. David's timely notice of appeal followed.

## II. DISCUSSION

### A. *Standard of Review*

A motion for judgment on the pleadings is analogous to a general demurrer. (*Smiley v. Citibank* (1995) 11 Cal.4th 138, 146 (*Smiley*); *Bezirdjian v. O'Reilly* (2010) 183 Cal.App.4th 316, 321 (*Bezirdjian*).) Thus, a plaintiff may make a motion for judgment on the pleadings on the grounds that "the complaint states facts sufficient to constitute a cause or causes of action . . . and the answer does not state facts sufficient to constitute a defense to the complaint." (Code Civ. Proc., § 438, subd. (c)(1)(A).) A

5

motion for judgment on the pleadings should be granted when, " 'under the state of the pleadings, together with matters that may be judicially noticed, it appears that a party is entitled to judgment as a matter of law.' " (*Bezirdjian, supra,* 183 Cal.App.4th at p. 321.) In contrast, judgment on the pleadings is inappropriate where there are " 'material factual issues that require evidentiary resolution.' " (*Southern California Edison Co. v. City of Victorville* (2013) 217 Cal.App.4th 218, 227 (*Southern California Edison*).)

Our review of a trial court's order granting a motion for judgment on the pleadings is de novo. (*Bezirdjian, supra,* 183 Cal.App.4th at p. 321.) For purposes of this review, we assume the truth of, and liberally construe, all properly pleaded factual allegations with a view toward obtaining substantial justice. (*Bezirdjian, supra,* 183 Cal.App.4th at p. 321; *Katzeff v. Department of Forestry & Fire Protection* (2010) 181 Cal.App.4th 601, 607 (*Katzeff*).) In addition to the pleadings, we may examine outside evidence that was considered by the trial judge without objection as well as matters subject to judicial notice. (*Bezirdjian, supra,* 183 Cal.App.4th at p. 321; *Katzeff, supra,* 181 Cal.App.4th at p. 607.) We are not bound by the trial court's determination, but must rather independently determine whether the challenged pleading states a cause of action as a matter of law. (*Smiley, supra,* 11 Cal.4th at p. 146; *Southern California Edison, supra,* 217 Cal.App.4th at p. 227.)

## B.     *Extrinsic Evidence of Intent*

Perhaps the most fundamental rule in the construction of wills is that " 'a will is to be construed according to the intention of the testator as expressed therein, and this intention must be given effect as far as possible.' " (*Estate of Russell* (1968) 69 Cal.2d 200, 205 (*Russell*); see also Prob. Code, § 21102, subd. (a) ["[t]he intention of the transferor as expressed in the instrument controls the legal effect of the dispositions made in the instrument"].) Put another way, the objective of will construction is to "ascertain what the testator meant by the language [the testator] used." (*Russell, supra*, 69 Cal.2d at p. 206.) Thus, where the language of a will is definite, certain, and unambiguous, the testator's intention should be ascertained from the "four corners" of the instrument. (See *Estate of Barnes* (1965) 63 Cal.2d 580, 582-583; *Estate of Nunes* (1954) 123 Cal.App.2d

6

150, 155; see also *Citizens Business Bank v. Carrano* (2010) 189 Cal.App.4th 1200, 1205, 1207 (*Carrano*).)

Equally clear, however, is the proposition that extrinsic evidence may be considered in the construction of a will when the language of the will is ambiguous. (Prob. Code, § 6111.5 ["[e]xtrinsic evidence is admissible . . . to determine the meaning of a will or a portion of a will if the meaning is unclear"]; *id.,* § 21101, subd. (c) [the use of extrinsic evidence is permissible, to the extent authorized by law, "to determine the intention of the transferor"].) An ambiguity arises when language may be applied in more than one way. (*Estate of Dye* (2001) 92 Cal.App.4th 966, 978 (*Dye*).) In other words, a document is ambiguous when " 'the written language is fairly susceptible of two or more constructions.' " (*Russell, supra,* 69 Cal.2d at p. 211.)

Ambiguities may be either latent or patent. "A patent ambiguity is an uncertainty which appears on the face of the will." (*Russell, supra,* 69 Cal.2d at p. 207.) A latent ambiguity, in contrast, is "one which is not apparent on the face of the will but is disclosed by some fact collateral to it."[4] (*Russell, supra,* 69 Cal.2d at p. 207.) Thus, an ambiguity may not always be ascertainable from the language of the will, itself. Rather, "[i]n order to determine initially whether the terms of *any written instrument* are clear, definite and free from ambiguity the court must examine the instrument in the light of the circumstances surroundings its execution so as to ascertain what the parties meant by the words used. Only then can it be determined whether the seemingly clear language of the instrument is in fact ambiguous." (*Id.* at pp. 208-209; see also *id*. at p. 209 [noting that when " 'a judge refuses to consider relevant extrinsic evidence on the ground that the meaning of written words is . . . plain and clear, [this] decision is formed by and wholly based upon the completely extrinsic evidence of [the judge's] own personal education and experience' "].)

---

[4] Typically, a latent ambiguity arises either where two persons or things exactly match the description in a will or where no person or thing perfectly matches the description, but two or more persons or things are an imperfect match. (*Carrano, supra,* 189 Cal.App.4th at p. 1205; see also *Russell, supra,* 69 Cal.2d at p. 207.)

However, "an ambiguity, whether patent or latent, must reside *in* the will." (*Dye, supra,* 92 Cal.App.4th at p. 978; see also *Curry v. Moody* (1995) 40 Cal.App.4th 1547, 1554 ["evidence of the meaning the parties gave to the contract language is only relevant if the contract language itself is reasonably susceptible to that meaning"] (*Curry*).) As the Third District elucidated in *Dye*: "To say that language is ambiguous is to say there is more than one semantically permissible candidate for application, though it cannot be determined from the language which is meant. Every substantial claim of ambiguity must tender a candidate reading of the language which is of aid to the claimant. One must ask what meanings are proffered and examine their plausibility in light of the language." (*Dye, supra,* 92 Cal.App.4th at p. 976.) Thus, for instance, the *Dye* court rejected the argument that testamentary language giving a husband's estate to his wife " 'to be her sole and separate property' " was ambiguous and could reasonably be read as granting the estate to the wife's heir if she predeceased her husband. (*Id.* at p. 979.) Similarly, as another appellate court has opined, "extrinsic evidence cannot be used to show that when the parties said 'Bunker Hill Monument' they meant 'the Old South Church' or that when they said 'pencils' they really meant 'car batteries.' " (*Curry, supra,* 40 Cal.App.4th at p. 1554; see also *Estate of Edwards* (1988) 203 Cal.App.3d 1366, 1371 [" '[t]he intention which an interpretation of a will seeks to ascertain is the testator's intention as expressed in the words of the will, not some undeclared intention which may have been in his [or her] mind' "].)

Put in the language of *Russell*, a latent ambiguity arises only when, in light of the extrinsic evidence offered, "*the provisions of the will* are reasonably susceptible of two or more meanings claimed to have been intended by the testator." (*Russell, supra,* 69 Cal.2d at p. 212, italics added.) If, in contrast, " 'the evidence offered would not persuade a reasonable [person] that the instrument meant anything other than the ordinary meaning of its words, *it is useless*.' " (*Id*. at p. 211, italics added.) Here, even if we assume that the extrinsic evidence offered by David provides some evidence that Paul intended to create only a life estate for Susan in his share of the Community Property, David has failed to raise any semantic ambiguity in the Will, itself. Rather, the relevant

8

provision in the Will provides: "I further give, devise, and bequeath to my wife" my one-half share of the Community Property. This unrestricted gift can hardly be read as providing for a restricted life estate in that Community Property. (See Prob. Code, § 21122 [technical words should be taken in their technical sense unless the context clearly indicates otherwise or the language was drafted by a transferor unacquainted with their technical sense].) Thus, the language of Paul's bequest is not "reasonably susceptible" to the meaning advanced by David.[5]

Further, even if—as David urges—we were to consider the language of the Contract and the Amendment together with the language of the Will when determining whether an ambiguity exists, we would reach the same result.[6] The Will clearly intends a

---

[5] The majority of cases cited by David in support of his position are inapposite as each involves the creation of a life estate based on ambiguous language contained in the instrument itself. (See *Estate of Mulholland* (1971) 20 Cal.App.3d 392, 395, 397-398 [creation of life estate by language in mutual will granting residue of estate to the survivor with the survivor's estate going to certain grandchildren upon her death]; *Estate of Morse* (1970) 9 Cal.App.3d 411, 414, 416-417 [creation of life estate by language in joint and mutual will providing for surviving spouse to receive residue of decedent's estate and further providing that any of such estate remaining at her death be devised to certain of their issue]; *Estate of Cooper* (1969) 274 Cal.App.2d 70, 72-73, 78 [language in mutual will that left decedent's property to surviving spouse " 'for . . . her own use and benefit' " along with required distribution to designated beneficiaries upon her death created life estate]; *Estate of Smythe* (1955) 132 Cal.App.2d 343, 345, 352-353 [devise to Ruth Smythe "for her during her life time, as she may need or see fit to use" with any remainder to be divided between two organizations interpreted to create a life estate]; see also *Adams v. Prather* (1917) 176 Cal. 33, 35, 37-38 [holographic will leaving estate to surviving spouse with remainder to be given to certain named relatives upon his death creates a life estate].)

[6] It is true that in *Ike v. Doolittle* (1998) 61 Cal.App.4th 51, the court appears, without explanation, to have considered the language of the trust along with the language of a contemporaneously executed property agreement in determining that the trust language was ambiguous. (*Id.* at pp. 74-76.) However, *Ike* dealt with numerous patent ambiguities in the text of a trust based on admitted errors in drafting. Thus, there was some language in the trust, itself, that was reasonably susceptible to alternative meanings. (*Id.* at pp. 56, 59-65, 67-68, 75-79.) Further, there was overwhelming extrinsic evidence of intent contrary to the intent imperfectly presented in the text of the trust. (Id. at pp. 67-69, 76-77.) For these reasons, we find *Ike* of little use in the resolution of this case.

devise in fee to Susan and restricts the power of the executor to sell the Residence during Susan's lifetime. The Contract requires only that Susan not revoke the provision in her will leaving any Community Property remaining upon her death to the couple's six children. And, while the Amendment does speak in terms of the "utilization," "enjoyment" and "management" of the Community Property, it does so not to restrict Susan's rights, but as a means of explicating the "full freedom" and "complete and unrestricted right" of the surviving spouse to act with respect to the Community Property. Finally, the Will expresses Paul's desire that his family respect the bequests made in his Will, and the Amendment indicates that the "manner of utilization and enjoyment" of the Community Property by the surviving spouse "shall not be subject to challenge by any of the children." In our opinion, these documents, taken together, do not support David's assertion that Paul intended to grant Susan a life estate instead of a fee interest in the Community Property. Had Paul intended to do so, he could easily have included language to that effect in the Will. (See, e.g., cases cited in footnote 5, *ante* at p. 9.) Similarly, Paul could have expressly incorporated the Contract and Amendment into the terms of a revised will, something he clearly knew how to do as the Contract expressly incorporated the terms of both Paul's Will and Susan's will. (See Prob. Code, § 6130 [a writing in existence when a will is executed may be incorporated by reference if it is adequately described and the language of the will manifests the intent to incorporate].) Instead, he chose to make an unrestricted grant to his wife, while at the same time obtaining her separate contractual agreement to devise any Community Property left at her death to the couple's six children. Should Susan ever breach this contractual obligation, one or more of the couple's children—including David—might, at that point, have proper recourse to the courts. This, however, is not that case. Under the present circumstances, Paul's clear intent as expressed by all three of his estate planning documents should be respected.

## III. DISPOSITION

In this case, David asks us to authorize a "trial on intent to take the place of a lawful will." (*Dye, supra,* 92 Cal.App.4th at p. 977.)  We decline his invitation.  The judgment is affirmed.  Respondent is entitled to her costs on appeal.


_____
REARDON, J.


We concur:


_____
RUVOLO, P. J.


_____
HUMES, J.