[No. A122642. First Dist., Div. Four. Jan. 28, 2010.]

PAUL KATZEFF, Plaintiff and Appellant, v.
DEPARTMENT OF FORESTRY AND FIRE PROTECTION et al.,
Defendants and Respondents;
GREGG KULJIAN et al., Real Parties in Interest.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.D.–E.

602

COUNSEL

Paul V. Carroll for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, Mary E. Hackenbracht, Assistant Attorney General, and Anita E. Ruud, Deputy Attorney General, for Defendants and Respondents.

Ryan F. Perkins for Real Party in Interest Gregg Kuljian.

Carter & Momsen, Jared G. Carter, Brian C. Carter and Daniela M. Pavone for Real Party in Interest Ed Powers.

## OPINION

**RIVERA, J.**—In this case, we are called upon to decide whether California's Department of Forestry and Fire Protection (CDF) properly granted an exemption allowing the harvesting of less than three acres of timber without environmental review, when one of the mitigation measures to two prior timber harvesting plans for the same property was that the trees in question remain in place to protect a neighboring property from excessive wind. The trial court decided CDF properly granted the exemption, and entered judgment on the pleadings in plaintiff Paul Katzeff's action for violations of the California Environmental Quality Act (CEQA) (Pub. Resources Code,[1] § 21000 et seq.), violations of the Z'berg-Nejedly Forest Practice Act of 1973 (§ 4511 et seq.) (the FPA), and nuisance. We reverse.

## I. BACKGROUND

This action was brought against CDF, Gregg Kuljian, and Ed Powers (collectively respondents) in April 2008, seeking to set aside CDF's approval of an exemption allowing the conversion of less than three acres of timber on Kuljian's property. According to the first amended complaint and petition for writ of mandate (the complaint),[2] plaintiff and Kuljian own adjoining parcels of property. In 1988, CDF approved a Timber Harvest Plan (THP) on Kuljian's land (the property) (the 1988 THP).[3] CDF concluded that the THP as proposed would allow wind to be funneled and accelerated, creating a threat of damage to Katzeff's property and home. Accordingly, as one of the conditions of approval, CDF required that " 'no trees . . . be removed from within 200 feet of [Katzeff's home] unless prior approval is obtained from [Katzeff].' "

CDF approved another THP for the same location 10 years later, in 1998 (the 1998 THP). Noting the apparent effectiveness of the wind buffer, CDF again required the landowner to refrain from cutting down trees within 200 feet of Katzeff's house.

Some years later, Powers sold the property to Kuljian. Kuljian could not afford to pay the purchase price, and so as a condition of the sale, he agreed

---

[1] All undesignated statutory references are to the Public Resources Code. Rule references cited as the Forest Practice Rules in text and as FP Rules parenthetically are to title 14 of the California Code of Regulations.

[2] Because this case comes to us after the trial court granted a motion for judgment on the pleadings, we accept as true all material facts of the complaint. (*Ludgate Ins. Co. v. Lockheed Martin Corp.* (2000) 82 Cal.App.4th 592, 602 [98 Cal.Rptr.2d 277] (*Ludgate*).) At Power's request, the trial court also took judicial notice of the administrative record in the case, and Katzeff does not contend it was improper for the court to do so.

[3] At the time, Kuljian did not own the property. As we will discuss, the complaint alleges that he bought the property shortly before the complaint was filed in 2008.

to seek a "conversion exemption" pursuant to section 4584, subdivision (g), and to give Powers the right to log and sell the timber.[4] In the application for the conversion exemption, Kuljian stated he intended to convert the timberland to an orchard. In April 2008, CDF "accepted and thereby approved" the conversion exemption.

In his first cause of action, Katzeff alleged that the conversion exemption violated the FPA and CEQA in that it would destroy a mitigation previously deemed necessary. In his second cause of action, he alleged that Kuljian did not have a bona fide intent to convert the land to an orchard. The third cause of action alleged a claim for private nuisance.

Powers moved for judgment on the pleadings on the ground that the complaint did not state a cause of action. (Code Civ. Proc., § 438, subd. (c)(1)(B).) The trial court granted the motion and dismissed the action in its entirety. Katzeff appealed.[5]

## II. DISCUSSION

### A. *Standard of Review*

" 'Review of a judgment on the pleadings requires the appellate court to determine, de novo and as a matter of law, whether the complaint states a cause of action. [Citation.] For purposes of this review, we accept as true all material facts alleged in the complaint. [Citation.] . . .' [Citation.] [¶] . . . '[W]e give the complaint a reasonable interpretation by reading it as a whole and all of its parts in their context. [Citations.] We are not concerned with a plaintiff's possible inability to prove the claims made in the complaint, the allegations of which are accepted as true and liberally construed with a view toward attaining substantial justice. [Citations.]' [Citation.]" (*Ludgate, supra*, 82 Cal.App.4th at p. 602.) "The grounds for the motion must appear on the face of the complaint, and in any matters subject to judicial notice. (Code Civ. Proc., § 438, subd. (d).)" (*Shea Homes Limited Partnership v. County of Alameda* (2003) 110 Cal.App.4th 1246, 1254 [2 Cal.Rptr.3d 739].)

---

[4] Section 4584, a portion of the FPA, provides in pertinent part: "Upon determining that the exemption is consistent with the purposes of this chapter, the board may exempt from this chapter, or portions thereof, a person engaged in forest management whose activities are limited to any of the following: [¶] . . . [¶] (g)(1) The one-time conversion of less than three acres to a nontimber use. . . ."

[5] Katzeff's notice of appeal was filed after the trial court made its order granting Power's motion for judgment on the pleadings as to all causes of action, but before judgment had been entered. We will treat it as having been filed immediately after entry of judgment. (Cal. Rules of Court, rule 8.104(e)(2).) On appeal, CDF has filed a respondent's brief addressing the first and second causes of action. Powers has joined CDF's brief and made additional arguments addressing all three causes of action. Kuljian has filed a one-page brief in which he "generally adopts" the other respondents' arguments.

B. *Requirements of FPA and CEQA*

■ " 'Timber harvesting operations in this state must be conducted in accordance with the provisions of the Forest Practice Act. The [FPA] was intended to create and maintain a comprehensive system for regulating timber harvesting in order to achieve two goals: (1) to ensure that "[w]here feasible, the productivity of timberlands is restored, enhanced, and maintained"; and ■ to ensure that "[t]he goal of maximum sustained production of high-quality timber products is achieved while giving consideration to values relating to recreation, watershed, wildlife, range and forage, fisheries, . . . and aesthetic enjoyment." (. . . § 4513.) . . .' [Citation.] [¶] **(2)** The [FPA] requires timber owners or operators on private land to submit a timber harvest plan specific to the site and planned logging activity to CDF for approval before harvesting. . . . [¶] CDF's approval of timber operations is generally subject to CEQA, but under section 21080.5, the [FPA's] regulatory scheme has been certified for exemption from CEQA's requirements for preparation of an environmental impact report (EIR) before approval of a project. [Citation.] 'Under the terms of section 21080.5, subdivision (c), that certification expressly exempts the timber harvesting plan process from the provisions of chapters 3 and 4 and section 21167 of CEQA. (§ 21080.5, subd. (c).) Chapters 3 and 4 deal, in large part, with the various requirements of an EIR at both the state level (ch. 3) and the local level (ch. 4). Section 21167 sets forth the time within which an action challenging a public agency's decision under the provisions of CEQA must be filed.' [Citation.]" (*Ebbetts Pass Forest Watch v. California Dept. of Forestry & Fire Protection* (2008) 43 Cal.4th 936, 942–943 [77 Cal.Rptr.3d 239, 183 P.3d 1210], citation omitted (*Ebbetts Pass*).)

■ Division Five of the First Appellate District explained the relationship between the requirements of the FPA and CEQA in *Friends of the Old Trees v. Department of Forestry & Fire Protection* (1997) 52 Cal.App.4th 1383, 1388 [61 Cal.Rptr.2d 297], as follows: "Under the [FPA] and its implementing regulations, hereafter Forestry Rules ([rule] 895 et seq.), . . . logging . . . [is] subject to [CDF's] approval of a site specific THP. [Citations.] The THP preparation and approval process is the functional equivalent of the preparation of an environmental impact report (EIR) contemplated by [CEQA] [citation]." "[W]ith the exception of certain specific provisions of CEQA relating to the 'procedural elements' of the EIR process, 'CEQA and its substantive criteria for the evaluation of a proposed project's environmental impact apply to the timber harvesting industry, and are deemed part of the [FPA] and the Forestry Rules.' [Citations.] The Supreme Court has . . . reiterated that timber harvesting is not exempt from adhering to the broad policy goals of CEQA. To the contrary, the court held 'that in approving timber harvesting plans, the [administrative body] must conform not only to the detailed and exhaustive provisions of the [FPA], *but*

*also to those provisions of CEQA from which it has not been specifically exempted by the Legislature.*' [Citation.] [¶] ■ Significantly, the [FPA] and the Forestry Rules establish a statutory and regulatory framework that, construed together with CEQA, confers on [CDF] the obligation to see that cumulative impacts and alternatives to the project, as well as other specified environmental information, be taken into consideration in evaluating THP's." (*Id.* at p. 1393.) Moreover, "CDF has not only the authority but also the duty to approve, disapprove, and impose mitigation measures on timber harvest plans . . . ." (*Ebbetts Pass, supra,* 43 Cal.4th at p. 957.)

■ As explained in *Environmental Protection Information Center, Inc. v. Johnson* (1985) 170 Cal.App.3d 604, 609–610 [216 Cal.Rptr. 502], a THP "is an informational document designed to serve as an 'abbreviated' environmental impact report, setting forth proposed measures to mitigate the logging operation's potential adverse impact on the environment. CDF and public review of the THP prior to approval is intended to ensure that the adverse environmental effects are substantially lessened, particularly by the exploration of feasible less damaging alternatives to the proposed harvesting project. [¶] . . . [¶] Section 21080.5 [a part of CEQA], provides that the Secretary of the Resources Agency may certify a regulatory program of a state agency as exempt from the requirement of EIR preparation, if the program requires that a project be preceded by the preparation of a written project plan containing sufficient environmental impact information. To be certifiable, the agency's regulatory program must be governed by rules and regulations (1) which require that no project shall be approved if there are feasible alternatives or mitigation measures available which would substantially lessen any adverse impact on the environment (§ 21080.5, subd. (d)(2)(i)) . . . ."

C. *Destruction of Mitigation Measure*

Katzeff's first cause of action alleges that CDF violated both the FPA and CEQA by approving a conversion exemption that would destroy a mitigation it had previously deemed necessary under those statutory schemes. Katzeff argues that CDF's actions constituted improper "piecemealing" of a project, and that an agency may not delete a mitigation required by CEQA without supplemental environmental review. Respondents take the position that the approval was a ministerial act not subject to CEQA and that it bore no relationship to the mitigation measures required by the 1988 and 1998 THP's. They also argue that the THP's have long since expired, and with them their mitigation requirements.

■ Several statutes and rules bear upon the parties' arguments. Section 4581 forbids anyone to conduct timber operations unless a THP has been

submitted to CDF.[6] Section 4590, subdivision (a) provides that a THP is effective for no more than three years, unless extended pursuant to specified procedures. Forest Practice Rules, rule 1039.1 provides that the "effective period of the plan" is "the 3-year period following the date the plan is determined to be in conformance or otherwise becomes effective pursuant to PRC 4582.7. Timber operations shall commence no earlier than the expected date of commencement stated in the plan," except under certain conditions. The THP's at issue here were approved in 1988 and 1998. There is no dispute that the right to conduct timber operations under these THP's has expired.

■ Conversion exemptions are governed by section 4584 and Forest Practice Rules, rule 1104.1. As we have explained, section 4584 allows the State Board of Forestry and Fire Protection, upon determining that the exemption is consistent with the purposes of the FPA, to exempt from the FPA's requirements anyone whose activities are limited to, among other things, "[t]he one-time conversion of less than three acres to a nontimber use." (§ 4584, subd. (g)(1); see § 4521.3.) Rule 1104.1 establishes the requirements for such exemptions. Under rule 1104.1(a), the conversion exemption "is applicable to a conversion of timberland to a non-timber use only, of less than three acres in one contiguous ownership, whether or not it is a portion of a larger land parcel and shall not be part of a THP." ■ The notice of conversion exemption, which initiates the process, is required to contain certain material, including the names and addresses of the landowner, timber owner, and others; a legal description of the land at issue; certain maps; and a statement by the owner of the land to be converted certifying that the operation is a one-time conversion to nontimberland use, certifying that there is a bona fide intent to convert, specifying what the use will be after the conversion, and certifying that the landowner has not obtained a conversion exemption in the previous five years, unless a waiver had been granted. (FP Rules, rule 1104.1(a)(1).) As relevant here, timber operations conducted under rule 1104.1 are exempt from the conversion permit and THP requirements of the rules related to the conversion of timberland.

The presenting issue here is whether a conversion exemption that would destroy a mitigation required under now expired THP's may be approved without additional environmental review. The parties have drawn our attention to no case precisely on point, and our own research has disclosed none.

Katzeff contends this case is analogous to *Orinda Assn. v. Board of Supervisors* (1986) 182 Cal.App.3d 1145 [227 Cal.Rptr. 688] (*Orinda*). There, a developer sought to build a project that included office, commercial, retail and theater space in downtown Orinda, on a site occupied by a historic theater and bank building that would have been demolished by the project as

---

[6] Section 4582 sets out the necessary contents of a THP.

proposed. (*Id.* at pp. 1150–1153.) While environmental review of the project was proceeding under CEQA, the building inspection department issued an unconditional permit for demolition of the theater and bank building. Division Three of the First Appellate District concluded that this procedure violated CEQA because the "demolition was a phase of the overall Project; as such, it was subject to the same CEQA review as the rest of the Project, and the demolition permit could not be issued until the entire CEQA process was completed and the overall Project lawfully approved." (*Orinda,* at pp. 1145, 1171.) The court reasoned: "A public agency is not permitted to subdivide a single project into smaller individual subprojects in order to avoid the responsibility of considering the environmental impact of the project as a whole. 'The requirements of CEQA, "cannot be avoided by chopping up proposed projects into bite-size pieces which, individually considered, might be found to have no significant effect on the environment or to be only ministerial." [Citation.]' [Citation]." (*Ibid.*) The court noted that the demolition of the building had been considered part of the project from the outset, and that "[m]ost important, both the Board and the Planning Commission imposed *conditions* on the demolition of the Theatre and Bank Building as part of their approval of the Project. . . . If demolition could be segregated from other development activities and made nonreviewable, the requirements of CEQA would be avoided altogether . . . ." (*Id.* at p. 1172.)

 Several points in *Orinda* are significant here. First, *Orinda* states the well-established principle that a project cannot be divided into smaller parts that individually will not have a significant effect on the environment. Second, this rule is applicable even if one of the smaller parts might require only ministerial, rather than discretionary, approval. Third, where conditions are imposed on a project, those conditions—and the policies behind CEQA—cannot be avoided by applying for another approval apart from the larger project. (*Orinda, supra,* 182 Cal.App.3d at pp. 1171–1172.)

Here, respondents contend, issuance of the conversion exemption was a ministerial action that required no environmental review. Under *Orinda,* however, even if we accept the argument that the exemption was ministerial, an applicant cannot avoid environmental review of a portion of a larger project simply by securing a separate ministerial permit, particularly where the permit would undo the protective effects of conditions imposed on a project's approval.

We recognize that *Orinda* is not precisely on point because the demolition permit there was issued while the overall project was under review, while here the conversion exemption took place years later. But if that distinction were dispositive, any mitigation required by CEQA or the FPA could be nullified simply by the passage of time. As Katzeff points out, under this line

of reasoning, the wind buffer mitigation could permissibly be destroyed virtually as soon as it became necessary—that is, after the landowner had completed operations under the THP—because the landowner could simply seek a conversion exemption as soon as the right to conduct timber operations under the THP had expired. The conflict between this result and the intent of CEQA is self-evident.[7] As noted in another context, "[e]xpiration of the [approval] was an abstract occurrence that had no effect on the project's environmental impacts." (*Moss v. County of Humboldt* (2008) 162 Cal.App.4th 1041, 1056 [76 Cal.Rptr.3d 428].)

We see no principled distinction between a conversion exemption sought immediately after the right to harvest under a THP has expired, and one sought a decade later. Whether or not the legal right to harvest timber has expired, the environmental effects of the harvest are presumed to remain. The wind buffer was required in order to mitigate the effects of the timber harvest on Katzeff's property, and respondents offer no basis for a conclusion that the mitigation expires as a matter of law once the time to complete the timber harvesting—the very action that creates the need for the mitigation—has expired.

*Lincoln Place Tenants Assn. v. City of Los Angeles* (2005) 130 Cal.App.4th 1491 [31 Cal.Rptr.3d 353] (*Lincoln Place*) is also instructive on this question. The owners of an apartment complex built in 1951 sought to demolish the apartments and replace them with new structures. (*Id.* at p. 1495.) As mitigation for the loss of the historical and architectural value of the apartments, the EIR recommended that before demolishing them, photographs should be taken of typical interiors and exteriors, drawings should be made of each type of unit and the site plan, and the structures should be offered for sale and removal to a new location. (*Id.* at p. 1498.) The city adopted the EIR. (*Id.* at p. 1500.) Afterward, however, the State Historical Resources Commission nominated the apartments for inclusion in the National Register of Historic Places, and while the nomination was pending, the owners applied for and obtained permits to demolish five of the structures on the property. (*Id.* at pp. 1500–1501.) The owners took the position that the demolition

---

[7] In any case, it appears that removal of the trees now at issue was part of the original 1988 THP proposal. The official response of the director of forestry to significant environmental effects raised during the THP evaluation process stated that storm winds were predicted to be funneled and accelerated "as a result of this operation," noted that Katzeff's home was within 200 feet of the southeast boundary of the plan, and provided that no trees should be removed within 200 feet of his home without prior approval. Furthermore, a "Wind Impact Analysis" prepared by CDF in December 1987 indicated that Katzeff's cabin and outbuildings were "near the southeast corner of the harvest area [and were] within striking distance of edge trees," and suggested as a mitigation measure that a wind buffer strip be left on the southeast corner of the harvest area. This discussion implies cutting down the trees Powers now seeks to harvest in fact *was* part of the original project as contemplated.

was not part of the building project, which was " 'an entitlement to build; . . . *not an entitlement to demolish*' "; therefore, according to the owners, they only had to comply with the conditions on the redevelopment project when they began building. (*Id.* at p. 1507.) The Court of Appeal rejected this distinction as "disingenuous at best," noting that under CEQA a " 'project' " is " '*the whole of an action*, which has a potential for resulting in' a direct or indirect physical change in the environment," and that "CEQA's requirements 'cannot be avoided by chopping up proposed projects into bite-size pieces which, individually considered, might be found to have no significant effect on the environment or to be only ministerial.' " (*Lincoln Place*, at p. 1507, fn. omitted.) Thus, on these facts, the court continued, "it cannot be argued CEQA does not apply to the . . . demolition on the ground demolition permits are ministerial acts." (*Lincoln Place*, at p. 1507, fn. 22, citing § 21080, subd. (b)(1) and *Friends of Westwood, Inc. v. City of Los Angeles* (1987) 191 Cal.App.3d 259 [235 Cal.Rptr. 788] [discussion of ministerial and discretionary acts].) The court noted that demolition of the existing apartments had always been part of the owners' plan and that the city had incorporated the mitigation measures into the project as conditions of approval, and went on: "Having placed these conditions on the demolition segment of the redevelopment project, the city cannot simply ignore them. Mitigating conditions are not mere expressions of hope." (*Lincoln Place, supra*, 130 Cal.App.4th at p. 1508.)

The court in *Lincoln Place* further noted that "[a]lthough the city cannot ignore the mitigating conditions it imposed on the . . . project it can modify or delete them. After a project has been approved and while it is still being developed a mitigation measure or condition of approval may be changed or deleted if the measure has been found to be impractical or unworkable." (*Lincoln Place, supra*, 130 Cal.App.4th at pp. 1508–1509.) For this, the court relied on *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 358–359 [110 Cal.Rptr.2d 579], which recognized that CEQA requires an agency to take steps to ensure that mitigation measures " 'will actually be implemented as a condition of development, and not merely adopted and then neglected or discarded.' " However, the court in *Napa Citizens* went on to conclude that nothing in the law required that "a mitigation measure, once adopted, is binding for all time." (*Napa Citizens*, at p. 359.) Rather, "when an earlier adopted mitigation measure has been deleted, the deference provided to governing bodies with respect to land use planning decisions must be tempered by *the presumption that the governing body adopted the mitigation measure in the first place only after due investigation and consideration.* We therefore hold that a governing body must state a legitimate reason for deleting an earlier adopted mitigation measure, and must support that statement of reason with substantial evidence." (*Ibid.*, italics added; see also *Mani Brothers Real Estate Group v. City*

*of Los Angeles* (2007) 153 Cal.App.4th 1385, 1388–1389, 1403 [64 Cal.Rptr.3d 79] [no need for supplemental EIR rather than addendum to EIR where substantial evidence supported city's conclusion mitigation measures no longer necessary].) Although the decision in *Napa Citizens* was made in the context of a land use plan, the court in *Lincoln Place* concluded that the rules adopted in *Napa Citizens* apply to all projects that come within CEQA. (*Lincoln Place, supra,* 130 Cal.App.4th at p. 1509.)

We likewise presume that CDF adopted the mitigation measure at issue only after due investigation and consideration. In fact, the administrative record indicates that this is the case. The wind impact analysis prepared in connection with the 1988 THP discusses the risk that, as a result of the project, storm winds would become "funneled and accelerated on the southeastern corner," near Katzeff's house, and would "deflect off the residual trees along the southern edge of the harvest area and will be directed to the corner." The analysis reviews the literature on this phenomenon and the ways to minimize its effects, and recommends a buffer strip as a mitigation measure, based on conversations with professors of silviculture at the University of California, Berkeley and at Humboldt State University.

 Consistent with the reasoning of the cases we have discussed, we conclude that where a public agency has adopted a mitigation measure for a project, it may not authorize destruction or cancellation of the mitigation—whether or not the approval is ministerial—without reviewing the continuing need for the mitigation, stating a reason for its actions, and supporting it with substantial evidence. There may be good reasons for CDF to conclude that the wind buffer is no longer necessary to protect Katzeff's house from the effects of the harvesting done pursuant to the 1988 and 1998 THP's. While the passage of time may have eliminated the need for the mitigation, it does not on its own render the mitigation inoperative, and CDF must justify its decision to allow the buffer strip to be cut down.[8]

---

[8] As our discussion indicates, our conclusion here does not depend on whether the issuance of a conversion exemption is ministerial or discretionary. We note, however, that the rules applying to conversion exemptions direct that significant adverse impacts should be taken into account when addressing a proposed conversion. Forest Practice Rules, rule 1104.1(a)(1)(E)(2) requires the notice of conversion exemption to include a statement by the owner of the timber certifying that, among other things, "there is [a] 'bona fide intent[,'] as defined in CCR 1100(b), to convert." Rule 1100(b) defines bona fide intent to mean "a present, sincere intention of the applicant to conform with and successfully execute the conversion plan, as determined by the Director in accordance with provisions of [rule] 1105.2." Rule 1105.2 provides: "The Director shall determine the applicant's bona fide intention to convert in light of the present and predicted economic ability of the applicant to carry out the proposed conversion; the environmental feasibility of the conversion, including, but not limited to, suitability of soils, slope, aspect, quality and quantity of water, and micro-climate; *adequacy*

Accordingly, we conclude the trial court erred in dismissing the first cause of action.

D., E.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III. DISPOSITION

The judgment is reversed. The stay of timber operations heretofore imposed by writ of supersedeas shall remain in effect pending finality of this opinion.

Ruvolo, P. J., and Sepulveda, J., concurred.

---

*and feasibility of possible measures for mitigation of significant adverse environmental impacts*; and other foreseeable factors necessary for successful conversion to the proposed land use." (Italics added.)

*See footnote, *ante*, page 601.