Filed 5/19/21  Coston v. Stanislaus County CA5
Opinion following transfer from Supreme Court

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JAMIE COSTON et al., | F074209 |
| Plaintiffs and Appellants, | (Stanislaus Super. Ct. No. 2016561) |
| v. | |
| STANISLAUS COUNTY et al., | **OPINION** |
| Defendants and Respondents; | |
| RB RANCH DEVELOPMENT, LLC et al., | |
| Real Parties in Interest. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Roger M. Beauchesne, Judge.

Law Office of Thomas N. Lippe and Thomas N. Lippe for Plaintiffs and Appellants.

Shute, Mihaly & Weinberger, Matthew D. Zinn, Sarah H. Sigman, Peter J. Broderick; John P. Doering, County Counsel, and Thomas E. Boze, Assistant County Counsel, for Defendants and Respondents.

Dennis Bunting, County Counsel (Solano), Peter R. Miljanich, Deputy County Counsel, and Jennifer Henning for the California State Association of Counties as Amicus Curiae on behalf of Defendants and Respondents.

Herum Crabtree Suntag and Steven A. Herum for Real Parties in Interest.

-ooOoo-

This matter has been transferred to us from the Supreme Court for reconsideration in light of *Protecting Our Water & Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479 (*Protecting Our Water*).

Appellants and plaintiffs challenge respondent Stanislaus County's (County) approval of well permit 2014-539, alleging the County failed (1) to perform environmental review required under the California Environment Quality Act (CEQA) (Pub. Resources Code, § 21000 et. seq.) and (2) to afford plaintiffs due process protections before issuing the permit. Prior to November 25, 2014, County had a policy not to apply CEQA's environmental review procedures to the approval of well permits.[1] Permit 2014-539 was approved under this policy.

The County obtained judgment on the pleadings on the grounds that its approvals of nonvariance well permits were categorically ministerial under CEQA. Thereafter, the Supreme Court decided *Protecting Our Water*, *supra*, 10 Cal.5th 479. In that opinion, the Supreme Court invalidated the County's categorical classification of well permit approvals as ministerial. As a result, the grounds for County's judgment on the pleadings have been wholly negated.

The County initially contended the judgment on the pleadings could still be affirmed on alternate grounds: There is substantial evidence the specific permit at issue here was properly classified as ministerial.[2] This contention is untenable on review of a judgment on the pleadings. We therefore reverse the judgment and remand to the trial court[3] for further proceedings.

---

[1] Except for variance permits, which are explained below.

[2] At oral argument, counsel for the County conceded that reversal and remand is proper in light of our conclusions in the recent case of *Protecting Our Water and Environmental Resources et al. v. County of Stanislaus et al.,* (Mar. 8, 2021, F073634) [nonpub. opn.] ("*POWER II*").

[3] Plaintiffs ask that we "remand to the County." However, at this juncture we are reviewing the trial court's ruling on the County's motion for judgment on the pleadings.

2.

**FACTS**

**I.      History of Water Well Standards in California**

In 1949, the Legislature enacted section 231 of the Water Code,[4] which then provided:

> "The department, either independently or in cooperation with any person or any county, state, federal or other agency, shall investigate and survey conditions of damage to quality of underground waters, which conditions are or may be caused by improperly constructed, abandoned or defective wells through the interconnection of strata or the introduction of surface waters into underground waters. The department shall report to the appropriate regional water pollution control board its recommendations for minimum standards of well construction in any particular locality in which it deems regulation necessary to protection of quality of underground water, and shall report to the Legislature from time to time, its recommendations for proper sealing of abandoned wells."[5]  (Stats.1949, ch. 1552, p. 2795.)

In 1967, the Legislature enacted sections 13800 through 13806 of the Water Code. (Stats.1967, ch. 323, pp. 1518–1519; see also Stats.1969, ch. 482, pp. 1081–1082.) Those statutes empowered the Department of Water Resources (DWR), after completing the studies and investigations described in section 231, to make a determination that a particular area of the state "need[s]" "water well construction, maintenance, abandonment, and destruction standards … to protect the quality of water used." (Stats.1967, ch. 323, p. 1518.)  Such a determination would then be reported to the area's regional water quality control board (regional board).  (*Ibid*.)  If the area's regional board

---

Our reversal of that ruling and the resultant judgment does not resolve the ultimate issue of what relief plaintiffs are entitled to in the trial court, if any.  The County may move for summary judgment or may prevail at trial.  Therefore, we must remand to the trial court for further proceedings.

[4] All further statutory references are to the Water Code unless otherwise stated.

[5] In 1969, the statute's reference to "regional water pollution control board[s]" was changed to "the appropriate California regional water quality control board." (Stats.1969, ch. 482, pp. 1047–1048.)  Otherwise, the statute's language remains in effect today as it was enacted in 1949.  (See § 231.)

concurred in DWR's determination, it was to make a report to the affected counties and cities and transmit any well standards that had been recommended by DWR. (*Ibid.*) The affected counties and cities would then have 120 days to adopt an ordinance establishing "standards of water well construction, maintenance, abandonment, and destruction." (*Ibid.*) If a county or city failed to so adopt an ordinance, the regional board could adopt such standards for the area. (*Id.* at p. 1519.) Standards adopted in that fashion would "have the same force and effect as if adopted as a county or city ordinance." (*Ibid.*)

### A. *Bulletin No. 74-68*

In February 1968, DWR published a document titled, Bulletin No. 74, Water Well Standards: State of California (Bulletin 74-68.)[6] Bulletin 74-68 stated that it was prepared as part of DWR's compliance with section 231.[7]

Bulletin 74-68 stated DWR's understanding that sections 13800 through 13806 "established a procedure for implementing standards developed under Section 231."

In Bulletin 74-68's foreword, the director of DWR stated, "The standards presented in this report are issued as guides to good practice for those engaged in the construction of water wells or in the regulation of water well construction and the destruction of abandoned wells in California." The Director claimed Bulletin 74-68 "fulfill[s] the need for a basic set of standards that are satisfactory under most conditions and which can be modified or expanded to accommodate local variations in geologic or ground water conditions." The foreword concluded by acknowledging that the standards would need to be revised and updated over time "in light of both changes in practice and the degree of success achieved in their application."

---

[6] This bulletin did not refer to itself as Bulletin 74-68. However, subsequent editions are identified as "Bulletin 74-" followed by the last two digits of the year it was published. For consistency, we will refer to the original Bulletin No. 74, published in 1968, as "Bulletin 74-68."

[7] A "preliminary edition" of this bulletin was issued in 1962. The 1962 edition was the first recommended statewide standards for water well construction and sealing.

4.

Bulletin 74-68 was organized into three chapters, titled "Introduction," "Standards," and "Destruction of Wells." Some of the chapters were further divided into parts, and some parts were further divided into sections. Relevant here, Chapter 2 (Standards) has a Part II titled "Well Construction." Section 8 of Part II is titled, "Well Location with Respect to Contaminants and Pollutants." It is this section, as later amended, that takes center stage in the present appeal.

### B.     *Chapter 9.36 of the Stanislaus County Code*

In 1973, County enacted Ordinance No. NS-443, the predecessor of Chapter 9.36 of the Stanislaus County Code.[8]  (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 490.)  It

---

[8] The County requests that we take judicial notice of several documents, including Ordinance No. 443; a memorandum of the Stanislaus County Health Officer; Stanislaus County Board of Supervisors Resolution No. 83-1750; Ordinance No. C.S. 1155; and excerpts of the 2016 California Building Code.  Plaintiffs object only to judicial notice of the Building Code excerpts.  Plaintiffs correctly note that only some building permits are ministerial.  But plaintiffs' contention goes to the persuasiveness of the argument the building code excerpts are intended to support, not the propriety of taking judicial notice.  We grant the County's request for judicial notice in its entirety.

Shortly before oral argument, plaintiffs filed another request for judicial notice. They apparently request that we take judicial notice of our opinion in *POWER II, supra*, F073634, and the model ordinance referenced in Water Code section 13801, subdivision (d).  While the request itself seeks notice of the recently filed opinion in *POWER II*, the exhibit attached to the request is the 2018 opinion in *Protecting Our Water and Environmental Resources et al. v. County of Stanislaus et al.* (Aug. 24, 2018, F073634), nonpublished opinion (*POWER I*).  It seems clear plaintiffs seek notice of the opinion in *POWER II*, rather than *POWER I*.  We grant the requests for judicial notice but observe that they do not alter our analysis or conclusions.

Plaintiffs' request for judicial notice also contains substantive argument akin to a supplemental brief.  For example, plaintiffs suggest this court in *POWER II* "introduced a new issue" when it observed that the plaintiffs in that case had invoked Water Code section 13801 without explaining the actual consequences of the statute's potential applicability.  We disagree.  The plaintiffs in *POWER II* had argued that section 13801 required the County to incorporate provisions from Bulletin 74.  The plaintiffs in the present case offer a similar argument.  However, *POWER II* simply pointed out that the statutory consequence of plaintiffs' claim was not automatic incorporation of provisions from Bulletin 74, as their argument implied.  Rather, the consequence was imposition of a model ordinance in the jurisdiction.  (§ 13801, subd. (d).)  In other words, *POWER II*

provides that a permit from the county health officer is required to construct, repair, or destroy a water well.  (Stanislaus County Code, § 9.36.030.)

Chapter 9.36 establishes several standards for water well construction.  It also imports certain standards from Bulletin No. 74 as follows:

> "Except as may be otherwise provided by this chapter, standards for the construction, repair, reconstruction, or abandonment of wells shall be as set forth in Chapter II of the Department of Water Resources Bulletin No. 74, 'Water Well Standards' (February 1968), or as subsequently revised or supplemented, which are incorporated in this chapter and made a part of this chapter."

"Chapter 9.36 also allows for variance permits.  The county health officer 'may authorize an exception to any provision of this chapter when, in his/her opinion, the application of such provision is unnecessary.'  (Stanislaus County Code, § 9.36.110.)  When authorizing a variance, the health officer may prescribe 'such conditions as, in his or her judgment, are necessary to protect the waters of the state ….'  (Stanislaus County Code, § 9.36.110.)"  (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 491.)

## C.     *Bulletin 74-81*

DWR updated Bulletin No. 74 in December 1981.  We refer to this updated bulletin as Bulletin 74-81.  Bulletin 74-81 is a nearly 100-page document which, like its predecessor, is "filled with technical specifications for water wells …."  (See *California Groundwater Assn. v. Semitropic Water Storage Dist.* (2009) 178 Cal.App.4th 1460, 1469.)

---

simply applied the *full text* of a statute *invoked by the plaintiffs themselves*.  There is a difference between an opinion raising a new issue versus a party declining or failing to address " 'an issue [or] mode of analysis … that is raised or fairly included within the issues raised' " on appeal.  (*Save Laurel Way v. City of Redwood City* (2017) 14 Cal.App.5th 1005, 1015, fn. 9.)

In any event, we order that the supplemental briefing of issues contained within the request for judicial notice is stricken, since it is made without leave to offer supplemental briefing.

Chapter I of Bulletin 74-81, entitled "Introduction," describes the history of well standards in the state.

Chapter II of Bulletin 74-81, entitled "Standards," is split into three parts: "General" (Part I); "Well Construction" (Part II); and "Destruction of Wells" (Part III). The section 8 standards referenced throughout this opinion are located in Part II of Chapter II.

At the beginning of Chapter II, before Part I even begins, there is a two-paragraph preamble. Relevant here, the first paragraph reads:

> "The standards presented in this chapter are intended to apply to the construction (including major reconstruction) or destruction of water wells throughout the State of California. However, under certain circumstances, adequate protection of ground water quality may require more stringent standards than those presented here; under other circumstances, it may be necessary to substitute other measures which will provide protection equal to that provided by these standards. Such situations arise from practicalities in applying any standards or, in this case, from anomalies in ground water geology or hydrology. Since it is impractical to prepare standards for every conceivable situation, provision has been made for deviation from the standards as well as for additional ones. However, the Department believes that for most conditions encountered in the State, the standards presented in this report are satisfactory for the protection of ground water quality."

After the preamble section, Part I of Chapter II begins.

Section 3 of Part I of Chapter II is entitled. "Exemption Due to Unusual Conditions," and provides:

> "If the enforcing agency finds that compliance with any of the requirements prescribed herein is impractical for a particular location because of unusual conditions or if compliance would result in construction of an unsatisfactory well, the enforcing agency may waive compliance and prescribe alternative requirements which are "equal to" these standards in terms of protection obtained."

7.

Section 5.A. of Part II of Chapter II, provides:

> "In locations where existing geologic or ground water conditions require standards more restrictive than those described herein, such special additional standards may be prescribed by the enforcing agency."

### D.       *County's CEQA Regulations*

"In 1983 County adopted its own CEQA regulations which generally classified issuance of all well construction permits as ministerial projects unless the county health officer granted a variance.  A variance permit was designated as a discretionary project, triggering environmental review.  As enacted, County's regulations provided that the issuance of a nonvariance well construction permit was presumed to be ministerial '[i]n the absence of any discretionary provision contained in the relevant ordinance.'  The parties stipulated that County's practice has been to treat *all* nonvariance permit issuances as ministerial.  This practice ignores the quoted clause, which mirrors language in CEQA Guidelines, section 15268, subdivision (b)." (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 491.)

### E.       *Water Code Section 13801*

In 1986, the Legislature amended section 13801.  (Stats.1986, ch. 1152; see also *California Groundwater Assn. v. Semitropic Water Storage Dist.*, *supra*, 178 Cal.App.4th at pp. 1468–1469.)  As amended, section 13801, subdivision (c) required that counties adopt a water well ordinance "that meets or exceeds the standards contained in Bulletin 74-81" by January 15, 1990.[9]  (§ 13801, subd. (c).)

Through this statute, the Legislature has established the standards in Bulletin 74-81 as the "baseline for local ordinances." (*California Groundwater Assn. v. Semitropic*

---

[9] If they failed to do so, a model ordinance prepared by the State Board of Water Resources would take effect in that jurisdiction on February 15, 1990.  (§ 13801, subd. (d).)

*Water Storage Dist.*, *supra*, 178 Cal.App.4th at p. 1469.)  However, "the Legislature did not adopt Bulletin 74-81 as state law."  (*Ibid*.)

### F.    *Bulletin 74-90*

"In 1991, a supplement was issued as bulletin No. 74-90."  (*Protecting Our Water*, *supra*, at p. 490, fn. 5.)  Bulletin 74-90 revised some of the standards contained in Bulletin 74-81.  All other standards in Bulletin 74-81 remain in effect.

In its "General Introduction," Bulletin 74-90 has a section titled "Limitations of Standards."  That section provides, in pertinent part:

"Well standards contained in Bulletin 74-81 together with well standards in this supplement (Bulletin 74-90) are *recommended minimum* statewide standards for the protection of ground water quality.  *The standards are not necessarily sufficient for local conditions*.  Local enforcing agencies may need to adopt more stringent standards for local conditions to ensure ground water quality protection.

"In some cases, it may be necessary for a local enforcing agency to substitute alternate measures or standards to provide protection equal to that otherwise afforded by DWR standards.  Such cases arise from practicalities in applying standards, and from variations in geologic and hydrologic conditions.  Because it is impractical to prepare "site-specific" standards covering every conceivable case, provision has been made for deviation from the standards.

"Standards in Bulletin 74-81 and this supplement (Bulletin 74-90) *do not ensure* proper construction or function of any type of well.  Proper well design and construction practices require the use of these standards together with accepted industry practices, regulatory requirements, and consideration of site conditions."  (Italics added.)

Bulletin 74-90 also revised sections 8 and 9 of Bulletin 74-81.

### G.    *Section 8*

"Section 8.A of the bulletin (Standard 8.A) addresses the distance between proposed wells and potential sources of contamination.  It requires that all wells 'be located an adequate horizontal distance' from those sources.  The standard lists separation distances that are generally considered adequate for specific situations.  For

9.

example, it notes that a well should be located at least 50 feet from any sewer line; 100 feet from any watertight septic tank or animal enclosure; and 150 feet from any cesspool or seepage pit.  However, the standard makes clear that the distances are not intended to be rigidly applied.  It notes that: '[m]any variables are involved in determining the "safe" separation distance;' '[n]o set separation distance is adequate and reasonable for all conditions;' and '[d]etermination of the safe separation distance for individual wells requires detailed evaluation of existing and future site conditions.'  It also provides that '[c]onsideration should … be given to adequate separation from sites or areas with known or suspected soil or water pollution or contamination.'  Significantly, it allows the agency to increase or decrease suggested distances, depending on attendant circumstances." (*Protecting Our Water*, *supra*, 10 Cal.5th at pp. 490–491, fn. omitted.)

"Standard 8.B provides that, '[w]here possible, a well shall be located up the ground water gradient from potential sources of pollution or contamination.'  Under Standard 8.C, '[i]f possible, a well should be located outside areas of flooding.' " (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 491.)

### H.      *Standard 9.A*

Standard 9.A requires that the annular surface seal for water wells must extend from ground surface to certain specified minimum depths (e.g., 20 feet below ground surface for agricultural and individual domestic wells.)  Standard 9.A permits the enforcing agency to grant exceptions to the listed minimum depths "where the water to be produced is at a depth less than 20 feet."  However, in no case may the annular seal extend less than 10 feet below land surface or be less than 10 feet long.  If a well is to be located closer to a pollution or contamination source than otherwise allowed by Standard 8, then the annular seal must extend to a minimum depth of 50 feet.

Standard 9.A also provides for exceptions from the general requirement for annular seals to extend from ground surface:  "The top of an annular surface seal may be below ground surface in areas where freezing is likely, but in no case more than 4 feet

10.

below ground surface." The standard defines "freezing areas" as those where the mean length of the freeze-free period described by the National Weather Service is less than 100 days." The bulletin observes that those areas generally include portions of Modoc, Lassen, and Siskiyou Counties, as well as portions of the North Lahontan area and the area of Lake Arrowhead.

The top of an annular surface seal can also be below ground where traffic or "other conditions" require, so long as the "seal and casing extend to a watertight and structurally sound subsurface vault, or equivalent feature." Even in that situation, the top of the annular seal may not be more than 4 feet below ground surface.

## I.     *Chapter 9.37*

"In 2014, County's board of supervisors amended Chapter 9.37 to prohibit the unsustainable extraction and export of groundwater. (Stanislaus County Code, § 9.37.040, subd. A.) The amendment requires that future permit applications satisfy both Chapter 9.36 and Chapter 9.37, unless exempt from the latter. (Stanislaus County Code, § 9.37.045, subd. A.)"[10] (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 491, fn. omitted.)

## J.     *Permit 539*

On November 18, 2014, the County approved permit No. 2014-539 providing for construction of a well on a property on Orange Blossom Road in Oakdale, California ("the permit" or "Permit 539"). At the time the permit was approved, the County's policy was to *not* apply CEQA's environmental review procedures to well permit decisions under Chapter 9.36.[11]

---

[10] Plaintiffs request that this court take judicial notice of Chapter 9.37 of the Stanislaus County Code and excerpts from the record in the *POWER I* appeal. We grant these unopposed requests.

[11] Except for variance permits under Chapter 9.36.110. Permit 539 is not a variance permit.

## II.    Present Litigation

On October 16, 2015, seven individuals who own other properties on Orange Blossom Road ("appellants" or "plaintiff")[12] filed a CEQA action, seeking a writ of mandate invalidating the permit.[13]  Specifically, the petition claimed that Chapter 9.36 of the Stanislaus County Code requires that the County exercise discretion in deciding whether to issue well construction permits.  Plaintiffs asserted that because the decision was discretionary, CEQA required environmental review, which the County did not perform.

In a second cause of action, the petition alleged the County violated plaintiffs' procedural due process right to notice and an opportunity to be heard before a government's adjudicative decision deprives them of a significant property interest.  Specifically, the petition alleged the County's issuance of the well permit "has caused and threatens to continue to cause a substantial interference with [plaintiffs'] property interests including but not limited to loss of groundwater supply in [plaintiffs'] wells; increased traffic congestion; increased risk of traffic accidents; increased air pollution by dust, pesticide drift, diesel pump generator exhaust, and increased noise pollution."

### A.    *Protecting Our Water and Environmental Resources v. Stanislaus County*

More than a year before the present suit began, another lawsuit was filed in Stanislaus County Superior Court challenging the County's policy of treating standard well construction permits as discretionary.  That case was decided by the same judge as the present case, and was titled *Protecting Our Water and Environmental Resources, et al. v. Stanislaus County et al.*, Stanislaus County Case No. 2006153 (the "*POWER*

---

[12] Plaintiffs refer to themselves as "plaintiffs" rather than "petitioners."  We will do the same.

[13] Plaintiffs named Stanislaus County; its Board of Supervisors; Jami Aggers, the Director of Environmental Resources at the Department of Environmental Resources (DER) and Janis Mein, the Manager of the DER as respondents.

12.

case").  On February 16, 2016, the superior court entered judgment in the *POWER* case in favor of the County, after concluding that the issuance of standard well permits under Chapter 9.36 was a ministerial act under CEQA.

## B.  *Motion for Judgment on the Pleadings*

Shortly after judgment was entered in the *POWER* case, the County moved for judgment on the pleadings in the present case.  The County asked the superior court to take judicial notice of its own decision in the *POWER* case, which it argued "disposes of this case as well."

The superior court granted the County's motion for judgment on the pleadings with leave to amend,[14] concluding that the issuance of the well construction permit was ministerial, and that fact was fatal to plaintiffs' CEQA and due process claims.

## C.  *Appellate Proceedings in Present Action*

In an unpublished decision filed on August 24, 2018, this court reversed the trial court's judgment.  (*Coston et al. v. Stanislaus County et al.* (Aug. 24, 2018, F074209) [nonpub. opn.] at p. 25 (*Coston I*).)  In that opinion, we focused on section 8(A) of the bulletin, which provided:  " 'All water wells shall be located an adequate horizontal distance from known or potential sources of pollution and contamination.' "  (*Id*. at p. 11, fn. omitted.)  We held that "[d]etermining whether a particular spacing is 'adequate' inherently involves subjective judgment" (*id*. at pp. 13–14), and, therefore, the well permit issuances were discretionary under CEQA.

Two footnotes in our prior opinion are important here.

In footnote 15, we discussed Standards 8.B, 8.C, and 9:

> "Appellants also point to provisions in section 8(B), 8(C), and 9. Section 8(B) provides that, '[w]here possible, a well shall be located up the ground water gradient from potential sources of pollution or

---

[14] Plaintiffs elected not to amend their petition.

contamination.'  (Italics added.)  Section 8(C) states that, '*[i]f possible*, a well should be located outside areas of flooding'  (Italics added.)

" 'Possible' is a more objective standard than 'adequate.'  While determining whether something is 'possible' may require scientific expertise, the ultimate question being asked is objective (i.e., can this be done?) rather than subjective (i.e., should it be done this way?).

"Next, in section 9, the Bulletin provides for the minimum depths to which a well's annular seal must extend below ground surface.  An annular seal is 'a watertight seal placed between the well casing and the side wall of a drilled hole.'  (Stan. Co. Code, § 9.36.020(G).)  For example, the annular seals of individual domestic wells must extend at least 20 feet below ground surface.  But the annular seal requirements do not have an overarching 'adequacy' standard.  Instead, the section lists actual 'minimum' depths that apply for each type of well, without the qualifying 'guidepost' language found in the contamination source spacing section.  Limited exceptions to the annular seal depth minimums are allowed in cases of shallow water depth, freezing areas, etc.  But even those exceptions have absolute minimum depths – e.g., 10-foot seal depth when water depth is less than 20 feet; 50-foot seal depth for wells near pollution source; four-foot seal depth for freezing areas; four-foot seal depth if subsurface vault or equivalent feature is used.  (*Coston I*, *supra*, F074209 at pp. 10–11.)

In footnote 16, we stated:  "The parties disagree … as to whether other provisions in the Bulletin are incorporated by section 9.36.150.  We need not resolve that issue because we conclude a provision the parties do agree was incorporated – i.e., the contamination source spacing standard – renders the issuance of well permits discretionary."  (*Coston I*, *supra*, F074209 at p. 11.)

**D.    *Appellate Proceedings in the POWER Case***

Plaintiffs also appealed the judgment in the *POWER* case, which we also reversed in a separate, unpublished decision filed August 24, 2018 (*POWER I*, *supra*, F073634 at p. 24).  The Supreme Court granted review of *POWER I*.

In an opinion filed August 27, 2020, the Supreme Court held that, "The plain language of Standard 8.A authorizes County to exercise 'judgment or deliberation when [it] decides to approve or disapprove' a permit.  (CEQA Guidelines, § 15357.)"

14.

(*Protecting Our Water*, *supra*, 10 Cal.5th at p. 496.) Consequently, permit issuances "in which County is required to exercise independent judgment under Standard 8.A cannot be classified as ministerial." (*Id*. at p. 497.) Accordingly, the Supreme Court affirmed our conclusion that the County's blanket ministerial categorization was unlawful.

However, the Supreme Court determined our holding was too broad because Standard 8.A only applies when there is a contamination source "near" a proposed well. (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 500.) Absent a nearby contamination source identified during the permit approval process, the issuance of a construction permit may be ministerial.[15] Therefore, the court held that while plaintiffs were entitled to a judicial declaration that the County's blanket ministerial categorization is unlawful, they were not entitled to a declaration that well permit issuances are always discretionary because of Standard 8.A.

After observing Standard 8.A would be implicated in some, but not all, permit applications, the Supreme Court said, "[t]he same principle would apply to Standards 8.B and 8.C." (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 500.) However, the court "declined to determine whether those provisions [i.e., Standards 8.B and 8.C] confer discretionary authority in some instances." (*Ibid*.) The court concluded that it need not address that issue in light of its conclusions regarding the authority granted by Standard 8.A.

---

[15] The Supreme Court did not reach the issue of what constitutes "near" for purposes of this rule. Determining what distance is sufficiently "near" to make Standard 8.A *applicable* would likely involve some of the same discretionary considerations used to determine whether that same distance is "adequate" to *satisfy* Standard 8.A.

Regardless, the Supreme Court's opinion seems clear that if it is determined as a preliminary matter that a well is not "near" its closest contamination source and no other discretionary decision is involved – then the County may proceed with a ministerial permit issuance.

The court continued,

"Even if Standards 8.B and 8.C might be understood to grant discretionary authority in some cases, we could not conclude that they would always do so. Standard 8.B only applies when a proposed well is downhill from a contamination source. Standard 8.C is only implicated when a proposed well is in a flood area. In other words, like Standard 8.A, Standards 8.B and 8.C may or may not be involved in the issuance of a particular permit." (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 500, fn. omitted.)

At the conclusion of that excerpt, the opinion includes the following footnote:

"Plaintiffs have also asked us to review whether (1) any other standards in Bulletin No. 74 are incorporated into Chapter 9.36 and (2) the inclusion of those standards makes permit issuance discretionary. The Court of Appeal declined to address these questions because it found that the discretion conferred by Standard 8.A made permit issuance a discretionary project. These questions should be answered by the Court of Appeal on remand in the first instance." (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 501, fn. 11.)

The Supreme Court noted that "the fact that an individual project is classified as discretionary does not mean that full environmental review, including an EIR, will always be required. The project may qualify for another CEQA exemption or the agency may be able to prepare either a negative declaration or a mitigated negative declaration after its initial study. Any of these circumstances would obviate the need for an EIR." (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 501.)

The Supreme Court concluded the plaintiffs were entitled to a declaratory judgment stating the County's blanket ministerial categorization is unlawful. (*Protecting Our Water*, *supra*, 10 Cal.5th at pp. 501–502.) However, the plaintiffs are not entitled to a judicial declaration that all permit issuance under Chapter 9.36 are discretionary; nor are they entitled to an injunction requiring County to treat all such permit issuances as discretionary. (*Id.* at p. 501.)

Finally, the opinion concludes by directing that "[t]he matter is remanded to the Court of Appeal for it to evaluate the questions it declined to answer and to reassess plaintiffs' entitlement to relief." (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 502.)

### E. *Transfer from Supreme Court*

After deciding *Protecting Our Water*, the Supreme Court transferred the present matter back to this court for reconsideration in light of that opinion.[16]

## DISCUSSION

## I. County Not Entitled to Judgment on the Pleadings in Light of Parties' Claims and Recent Supreme Court Precedent

The trial court granted County's motion for judgment on the pleadings. Plaintiffs challenge that ruling and judgment on appeal.

### A. *Law on Motions for Judgment on the Pleadings*

A motion for judgment on the pleadings "tests the sufficiency of a complaint." (*Stockton Citizens for Sensible Planning v. City of Stockton* (2012) 210 Cal.App.4th 1484, 1491.) We examine "only the face of the pleadings, together with matters subject to judicial notice, to determine whether such facts are sufficient to constitute a cause of action." (*California Water Impact Network v. Newhall County Water Dist.* (2008) 161 Cal.App.4th 1464, 1476.) We liberally construe the complaint and assume the truth of all properly pleaded factual allegations. (*Stockton Citizens for Sensible Planning v. City of Stockton*, *supra*, 210 Cal.App.4th at p. 1491; *Katzeff v. Department of Forestry & Fire Protection* (2010) 181 Cal.App.4th 601, 607.)

---

[16] The Supreme Court also remanded *Protecting Our Water* itself to this court. On March 8, 2021, this court filed an unpublished opinion again reversing the trial court's judgment in accordance with the Supreme Court's opinion. (*POWER II*, *supra*, F073634, petn. for review pending, petn. filed Apr. 19, 2021, S268334.)

At oral argument in the present case, counsel for the County conceded that our conclusions in *POWER II* preclude an affirmance here and that remand is necessary.

" ' "We are not concerned with a plaintiff's possible inability to prove the claims made in the complaint …." ' " (*Katzeff v. Department of Forestry & Fire Protection*, *supra*, 181 Cal.App.4th at p. 607.) The question is whether the complaint supports "any valid cause of action against the defendant …." (*Kempton v. City of Los Angeles* (2008) 165 Cal.App.4th 1344, 1347.)

We review the trial court's ruling de novo. (*Stockton Citizens for Sensible Planning v. City of Stockton*, *supra*, 210 Cal.App.4th at p. 1491.)

### B. *County's Motion*

In their petition, plaintiffs alleged the County issued Permit 539 without conducting required environmental review.

The County moved for judgment on the pleadings on the ground that the petition failed to allege a cause of action because the County's "well permit approvals are ministerial actions" and CEQA/due process principles do not apply to ministerial actions.[17] The County argued the present case presented "the identical legal issue presented" in *POWER*: "whether the County's well construction permits are discretionary or ministerial approvals." The County posited that its approvals of well construction permits – which would include Permit 539 – are ministerial. Therefore, according to the County, the court "need not decide any questions of fact." County contended that "[b]ecause the scope of the County['s] authority is a purely legal issue, the Court can properly resolve it on a motion for judgment on the pleadings."

At the hearing on the motion, counsel for the County said he wanted to address plaintiffs' argument that they can "put on evidence to show that there are *particular*

---

[17] The same ground formed the basis of County's attack on the first and second causes of action. Thus, for present purposes, the two causes of action rise and fall together.

The County does note in its briefing that it will argue on remand that plaintiffs cannot prove that any liberty or property interest was affected by the issuance of the permit and their due process claim fails as a result.

permits … for which the County … in fact exercised discretion." (Italics added.) Counsel for the County argued that plaintiffs' point was "irrelevant" because the court faced only legal questions: "[W]hat is the scope of the County's authority in issuing well construction permits? And does that authority make those decisions discretionary or ministerial at a matter of law?" Later, the County's counsel argued that even if plaintiffs' petition had alleged "that the County made X decision or Y decision or Z decision on a particular permit[, it] wouldn't matter, because this is a question of the scope of their legal authority."

In granting the County's motion for judgment on the pleadings, the court observed "parties agree the resolution of this case involves the precise issue of whether the County's issuance of well construction permits is ministerial or discretionary." The court concluded that, because the County's issuance of well construction permits was in fact a ministerial decision, the County was entitled to judgment on the pleadings.

## C.     *Analysis*

After the trial court issued its ruling, the Supreme Court invalidated the County's categorical classification of nonvariance permits as ministerial. (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 498.) And, as explained above, Permit 539 was approved under this now-invalid categorical classification. In other words, the grounds for the County's motion for judgment on the pleadings has been directly and wholly negated.

In supplemental briefing, the County acknowledges that the Supreme Court has now "disapproved the County's policy of treating all well-construction permits as ministerial." However, the County argues that "the record shows that the single permit at issue here was in fact ministerial." Thus, because of the intervening Supreme Court's opinion, the County is now making a permit-specific argument of the type it expressly

avoided in the trial court. Specifically, County argues that "substantial evidence" shows there was no potential source of contamination near the well site for Permit 539.[18]

This argument is untenable on review of a judgment on the pleadings. The question is not whether the *moving party*'s substantive factual assertions are supported by substantial evidence. Rather, the question is whether the allegations in the *opposing party's* pleadings have stated a cause of action (regardless of whether they are supported by evidence).

Here, the plaintiffs alleged the County did not perform the requisite environmental review before issuing Permit 539. Accepting that allegation as true, plaintiffs have stated a cause of action.

The County is correct that the Supreme Court has now held that Standard 8.A only applies when there is a contamination source "near" a proposed well. (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 500.) And, if there is no nearby contamination source, Standard 8.A does not confer discretion on that "individual issuance decision." (*Ibid*.) However, whether there is a contamination source "near" the site approved in Permit 539 (or whether such a contamination source was revealed during the permitting process) is a factual question. The fact that the County can point to substantial evidence in their favor on this factual question is irrelevant on a motion for judgment on the pleadings. Any attempt by the County to prevail on the factual issue of whether the application process has revealed (or failed to reveal) a contamination source "near" the site of permit 539 must await an evidentiary hearing, summary judgment, or trial.[19] "[J]udgment on the

_____

[18] For example, the area on the permit to indicate the proposed well's distance to the nearest sources of contamination (e.g., septic tank, seepage pit, etc.) is left blank except for a handwritten "N/A." Similarly, the permit's "plot plan" does not show any possible sources of contamination even though the directions indicate that "any … possible source of contamination" must be shown.

[19] Requests for judicial notice will not suffice here. A court may consider judicially noticed materials in resolving a motion for judgment on the pleadings. However, courts may not take judicial notice of the *truth* of the matters stated therein

pleadings must be denied where there are material factual issues that require evidentiary resolution. [Citation.]" (*Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1216.)

Because these grounds establish that plaintiff has stated a cause of action and the judgment on the pleadings must therefore be reversed, we do not address the parties' remaining contentions, which are immaterial to the disposition of the appeal.[20] (See *Martinez v. San Diego County Credit Union* (2020) 50 Cal.App.5th 1048, 1071.)

### D.     *Additional Observations*

As an aside, we note that while the County has pointed to some supporting evidence, it is by no means conclusive on the factual question at issue (i.e., whether there is a contamination source "near" the well site). The well permit application has a section intended for the applicant to input the "distance to nearest" contamination sources, such as septic tanks, seepage pits, animal enclosures, etc.[21] The County points to the handwritten text, "N/A" in the upper-left of this "distance to nearest" section of the application. However, the meaning of the handwritten "N/A" is unclear. By definition, every proposed well site on the planet is some distance to the "nearest" contamination source. Consequently, the fact that "N/A" is written in this area suggests the applicant was conveying that there are no such contamination sources *on the applicant's own*

---

(except court orders, judgments, and judicial findings of fact.) (*Bach v. McNelis* (1989) 207 Cal.App.3d 852, 865; see also *Davis v. Southern California Edison Co*. (2015) 236 Cal.App.4th 619, 632, fn. 11.) When the facts established by a document are reasonably subject to the dispute, they require formal proof and judicial notice will not suffice. (*Unruh-Haxton v. Regents of University of California* (2008) 162 Cal.App.4th 343, 364–365.)

[20] Our recent, unpublished opinion in *POWER II*, *supra*, F073634 addressed some of the other issues raised by the parties in this case.

[21] While this section lists several types of contamination sources, it does not provide for all types of contamination sources expressly identified by section 8.A, including: storage and preparation areas for pesticides, fertilizers, and other chemicals; or tanks and pipelines for storage and conveyance of petroleum products or other chemicals.

*property*.  Contamination, however, does not respect property boundaries.  A contamination source could be "near," even if it is located on a different "property" than the proposed well site.

The fact that this information provided on the permit application does not dispose of the nearby-contamination-source issue is highlighted by a different permit application in the record.  In the "Distance to Nearest" section of permit application No. 2013-271, there appears the handwritten word "None" next to "septic tank," "sewer lines," "seepage pit," etc.  Yet a memo in the County's file for the permit indicates the permit was "flagged in mitigation."  An e-mail in the County's file indicates there is a "contaminated site located approximately 500 feet south of this permit application."  Thus, it is clear the permit approval process can identify potential contamination sources even if the application itself discloses no such sources.

The contents of the County's file on permit No. 2013-271 – which included e-mails, memos, etc. – establish that the well permitting application process can sometimes involve more documentation and information than the permit application itself.  Thus, the fact that the *application* for Permit 539 does not disclose a nearby contamination source does not *necessarily* mean that no such source was "identified during the permit approval process …." (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 500.)

We acknowledge the plot plan on Permit 539 does require depiction of six categories of items, including item six: "sewage disposal systems *on adjoining property or within a radius of 100 ft.*" for private wells.  (Italics added.)  However, sewage disposal systems are just one of many forms that contamination sources can take.  Standard 8.A applies to all "potential sources of pollution and contamination."  That includes, but is not limited to, barnyard and stable areas; feedlots; tanks and pipelines for storage and conveyance of petroleum products or other chemicals; and storage and preparation areas for pesticides, fertilizers, and other chemicals.

In item four, the plot plan instructions direct that the applicant is to depict "house sewer outlet, public sewer, sewage disposal system, or proposed sewage, disposal system, industrial waste pond, *or any other possible source of contamination*."  (Italics added.)  However, item four does not contain item six's directive to include such sources that are "on adjoining property" or within a certain radius of the well site.

This is not to say the County cannot prove, at some point, that no contamination source "near" the well site was revealed during the permit approval process.  Nor is it to say that these aspects of the permit application cited by the County do not raise inferences in its favor.  We express no opinion on those matters.  Rather, we are pointing out some of the factual issues currently presented, which are inappropriate to resolve at this juncture of the case.

## DISPOSITION

The judgment is reversed, and the matter is remanded for further proceedings consistent with the views expressed in this opinion and in *Protecting Our Water, supra*, 10 Cal.5th 479.  Plaintiffs shall recover their costs on appeal.


POOCHIGIAN, Acting P.J.

WE CONCUR:


FRANSON, J.


PEÑA, J.

23.